¶ 1 We granted certiorari to determine: 1) whether a judicially developed exception to the Federal and Oklahoma Indian Child Welfare Acts — known as the "existing Indian family exception" — remains viable; and 2) whether evidence of the refusal to support the mother during the pregnancy is sufficient to warrant adoption without the father's consent under 10 O.S. 2001 § 7505-4.2[10-7505-4.2].[1] Even where the threshold requirements of the federal Act have been met, an exception to the statutory scheme known as the "existing Indian family exception" has been applied by courts when the Indian child proceeding does not involve the dissolution of an Indian family, or a family with a significant connection to the Indian community, or the removal of custody from an Indian parent.[2] We have previously followed those courts who have recognized and applied the exception, although *Page 1101 
the threshold requirements of the federal Act had been met.[3]
 ¶ 2 Because of recent statutory amendments to the Oklahoma Act,[4] which in essence codified the holding inMississippi Band of Choctaw Indians v. Holyfield, 490 U.S. 30,109 S.Ct. 1597, 104 L.Ed.2d 29 (1989), we determine that the "existing Indian family exception" is no longer pertinent to Indian child custody proceedings in Oklahoma and even if it were, the evidence is insufficient to support a finding that the child was eligible for adoption without the consent of the father. To the extent that In the Matter of S.C., 1992 OK 98,833 P.2d 1249; In the Matter of Adoption of Baby Boy D, 1985 OK 93,742 P.2d 1059, cert. denied by Harjo v. Duello, 484 U.S. 1072,108 S.Ct. 1042, 98 L.Ed.2d 1005 (1988); and In the Matter ofAdoption of D.M.J., 1985 OK 92, 741 P.2d 1386, are inconsistent with our holding, they are expressly overruled.
 FACTS ¶ 3 The appellee, Tiffany Leatherman (mother), was sixteen years old when she became pregnant in January of 2002.[5]
The appellant, Christopher Yancey (father), was a seventeen year old schoolmate and a member of the Muscogee (Creek) Indian Nation of *Page 1102 
Oklahoma (tribe). The mother is not a member of any Native American tribe. The child's paternity and the father's tribal membership is undisputed. However, other than being a member of the tribe, the father did not participate in any significant tribal activities or live within tribal boundaries.[6]
 ¶ 4 The mother and maternal grandmother moved in with the father and the fraternal grandmother near the end of February, 2002, and remained there until approximately the end of April. The fraternal grandmother provided support for the household. While the mother remained in school, the father quit school and began working at a local restaurant. After an altercation between the two, the mother moved and lived with her grandmother, later with her brother, and eventually returned to live with her father. Sometime around the time that the mother moved, she led the father to believe that she had miscarried the baby. The father insists that the mother told him she had miscarried the baby. The mother denies that she ever specifically told him that she miscarried.
 ¶ 5 In the summer of 2002, the mother decided to place the baby for adoption, and through her church, she found a couple from another state who wanted to adopt the baby. After meeting with an attorney for the adoptive parents, the mother was advised to notify the father immediately that she was still pregnant. In July of 2002, the mother told the father that she had not miscarried and that she planned to put the baby up for adoption. The father protested the adoption.
 ¶ 6 On October 4, 2002, the child was born in Shawnee, Oklahoma. The father attempted to see the mother and child at the hospital after the birth, but the mother and the hospital staff refused to let him have any contact with the baby. On October 14, 2002, the father employed a lawyer to represent him in seeking custody of the child and in preventing the adoption.
 ¶ 7 On December 26, 2002, the mother sought an order in Cleveland County that the child was eligible for adoption without the father's consent and for termination of his parental rights.[7] In her application, the mother asserted that the father's consent was unnecessary pursuant to 10 O.S. 2001 § 7505-4.2[10-7505-4.2](C)(1)[8] because he had not contributed to her support during the pregnancy. On January 6, 2003, the mother appeared in court and voluntarily relinquished her parental rights and consented to the adoption of the child.
 ¶ 8 On January 17, 2003, notice of the mother's application and adoption proceedings were given to the father, the Bureau of Indian Affairs, and the Muscogee (Creek) Nation. The father objected to the adoption. The Nation filed a motion to intervene on January 23, 2003, acknowledging that the child was eligible for membership and insisting that the Acts applied to the proceeding. The motion to intervene was granted the next day. On March 25, 2003, the Nation filed a motion to dismiss the mother's adoption proceeding, seeking compliance with placement preferences of the Acts. *Page 1103 
 ¶ 9 On September 5, 2003, the trial court entered an order, determining that: 1) the "existing Indian family exception" to the Acts controlled; 2) the father had neglected to contribute to the support of the mother to the extent of his financial ability during the pregnancy thus failing to establish his parental rights; and 3) the child was eligible for adoption without the consent of the father.[9] The father appealed. The Court of Civil Appeals affirmed. We granted certiorari on June 14, 2004.
 I.
¶ 10 THE "EXISTING INDIAN FAMILY EXCEPTION" IS NO LONGER A VIABLE DOCTRINE IN OKLAHOMA INSOFAR AS INDIAN CHILD CUSTODY PROCEEDINGS ARE CONCERNED.
A. Applicability of the Federal and Oklahoma Indian Child Welfare Acts and The "Existing Indian Family Exception."
 ¶ 11 The mother argues that because this proceeding does not involve the dissolution of an Indian family or the removal of custody from the Indian parent, it falls under the "existing Indian family exception" to the Acts. The federal Act[10]
was enacted in response to concerns regarding the consequences to Indian children, Indian families, and Indian tribes of state child welfare practices which had separated Indian children from their families and tribes.[11] To address these concerns, the Act provides "minium Federal standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes which reflect the unique values of Indian culture."[12]
 ¶ 12 The federal Act governs Indian child custody proceedings, including termination of parental rights and adoptions.[13]
It sets forth *Page 1104 
standards for terminating parental rights[14] and it recognizes the applicability of social and cultural standards.[15] The standards mandated by the federal Act preempt any state law which provides a lower standard of protection for the rights of the parent or the Indian custodian of an Indian Child.[16] The Oklahoma Act[17]
implements the federal Act.[18] It is undisputed that this child is an Indian child within the meaning of both Acts.
 ¶ 13 The watershed opinion was rendered in 1989, when the United States Supreme Court decided Mississippi Band of ChoctawIndians v. Holyfield, 490 U.S. 30, 109 S.Ct. 1597,104 L.Ed.2d 29 (1989), a case involving two young Indian parents who sought an adoption by non-Indians of newly-born twins. Although the parents lived on the reservation, they traveled away from the reservation for the birth of the children. The tribe opposed the adoption and sought jurisdiction in tribal court. The United States Supreme Court held that the children were domiciled on the reservation within the meaning of the federal Act's exclusive tribal court jurisdiction provision, even though the children were not present on the reservation.
 ¶ 14 In discussing the purpose and meaning of the Act, theHolyfield Court recognized that Congress was concerned not only about the interests of Indian children and families, but also about the impact on the tribes because of the large numbers of Indian children being adopted by non-Indians. The Court stated that:
 ". . . [I]t is clear that Congress' concern over the placement of Indian children in non-Indian homes was based in part on evidence of the detrimental impact on the children themselves of such placements outside their culture. Congress determined to subject such placements to the ICWA's jurisdictional and other provisions, even in cases where parents consented to an adoption, because of concerns going beyond the wishes of individual parents. . . ."
 ¶ 15 In 1992, this Court examined Holyfield's
implications.[19] In the Matter of S.C., *Page 1105 1992 OK 98, ¶ 21, 833 P.2d 1249 involved an Indian father who attempted to invalidate foster care after the non-Indian mother's parental rights were terminated. The father alleged thatHolyfield, supra, controlled the cause. The Court determined that Holyfield was inapplicable, and it held that the federal Act did not permit a non-custodial Indian parent to invalidate foster care placement. The Court also reaffirmed the application of the "existing Indian family exception" to Indian child custody proceedings in Oklahoma, largely ignoring Holyfield's language.
 ¶ 16 In 1994, within two years after our decision in S.C., supra, the Oklahoma Legislature, apparently in response to our opinions and in recognition of the Holyfield teaching, amended the Oklahoma Act. Prior to the amendment, 10 O.S. 1991 § 40.1[10-40.1] provided:
 "The purpose of the Oklahoma Indian Child Welfare Act is the clarification of state policies and procedures regarding the implementation by the State of Oklahoma of the Federal Indian Child Welfare Act, P.L. 95-608. It shall be the policy of the state to cooperate fully with Indian tribes in Oklahoma in order to ensure that the intent and provisions of the Federal Indian Child Welfare Act are enforced."
Title 10 O.S. 1991 § 40.3[10-40.3] provided in pertinent part:
 ". . . B. The Oklahoma Indian Child Welfare Act applies only to a child who is a member of an Indian tribe or who is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe . . ."
 ¶ 17 Section 40.1 was amended in 1994. It provides:
 "The purpose of the Oklahoma Indian Child Welfare Act is the clarification of state policies and procedures regarding the implementation by the State of Oklahoma of the federal Indian Child Welfare Act P.L. 95-608. It shall be the policy of the state to recognize that Indian tribes and nations have a valid governmental interest in Indian children regardless of whether or not said children are in the physical or legal custody of an Indian parent or Indian custodian at the time state proceedings are initiated. It shall be the policy of the state to cooperate fully with Indian tribes in Oklahoma in order to ensure that the intent and provisions of the federal Indian Child Welfare Act are enforced." (Emphasis added.)
Similarly, 10 O.S. 2001 § 40.3[10-40.3], was amended in 1994 and provides in pertinent part:
 ". . . B. Except as provided for in subsection A of this section, the Oklahoma Indian Child Welfare Act applies to all state voluntary and involuntary child custody court proceedings involving Indian children, regardless of whether or not the children involved are in the physical or legal custody of an Indian parent or Indian custodian at the time the state proceedings are initiated. . . ." (Emphasis added.)
 ¶ 18 When ascertaining legislative intent, the Court must presume that when adopting an amendment, the Legislature had knowledge of the law as it previously existed and had in mind the judicial construction placed on the law.[20] Under the current statutory scheme, the Oklahoma Act controls regardless of whether the child or children *Page 1106 
involved in the proceeding are in the physical or legal custody of an Indian parent or Indian custodian when the state proceedings are initiated. The change in the statute is an explicit repudiation of the "existing Indian family exception."[21]
 B. The Constitutionality of the Application of the Acts. ¶ 19 The mother insists that a refusal to apply the "existing Indian family exception" to the present cause could result in an unconstitutional application of the Acts. She relies primarily on the California Court of Appeals decision In re Bridget R.,41 Cal.App.4th 1483, 49 Cal.Rptr.2d 507, 529, (1996), cert. deniedCindy R. v. James R., 519 U.S. 1060, 117 S.Ct. 693,136 L.Ed.2d 616 (1997) to support her argument.
 ¶ 20 Bridget, supra, involved a father of Indian twins who sought to rescind his voluntary relinquishment of parental rights. After *Page 1107 
the trial court determined the relinquishment invalid, the appellate court reversed, holding that the Act would be unconstitutional and violate the Fifth, Tenth, andFourteenth Amendments unless it was limited by the "existing Indian family" doctrine.
 ¶ 21 In another California Court of Appeals case, In re SantosY, 92 Cal.App.4th 1274, 112 Cal.Rptr.2d 692, 731 (2001), the court reached a conclusion similar to the Bridget, supra, case.Santos, supra, involved a constitutional challenge to a trial court order which required the transfer of a child to placement with a member of the Indian tribe to which the child's sole connection was one-quarter genetic contribution from the mother who was an enrolled tribal member. The Santos court held that the application of the federal Act was unconstitutional under theFifth, Tenth, and Fourteenth Amendments to the United States Constitution when the child's sole connection to the tribe was the genetic contribution.
 ¶ 22 The Supreme Court of North Dakota rejected the rationale and constitutional analysis used by the California Appellate Courts in In the Interest of A.B., 2003 N.D. 98, 663 N.W.2d 625
(2003), cert. denied Hoots ex rel. A.B. v. K.B., ___ U.S. ___,124 S.Ct. 1875, 158 L.Ed.2d 466 (2004). A.B. involved the transfer of jurisdiction of a parental termination proceeding from state juvenile court to tribal court. The County argued that the transfer would be unconstitutional relying on the California Court of Appeals' decisions. The North Dakota Supreme Court held that the transfer was not unconstitutional. It determined that: 1) the United States Supreme Court has consistently rejected claims that laws which treat Indians as a distinct class violate equal protection; 2) the different treatment of Indians and non-Indians under the Act is based on the political status of the parents and children and the sovereign nature of the tribe; 3) the substantive due process and equal protection challenges were subject to a rational basis analysis and the Act was rationally related to the protection of the integrity of American Indian families and tribes and is rationally related to the fulfillment of Congress's unique guardianship obligations toward Indians; and 4) Congress's plenary power to legislate Indian matters is well established and the Act is a rational exercise of that power which does not violate the Tenth Amendment.
 ¶ 23 We agree with the North Dakota Supreme Court's rationale and find it equally applicable to the present cause. We hold that the Acts are not unconstitutional as applied to this cause.
 II. ¶ 24 EVEN IF THE EXISTING INDIAN FAMILY EXCEPTION WERE VIABLE,THE EVIDENCE IS INSUFFICIENT TO SUPPORT A FINDING THAT THE CHILDWAS ELIGIBLE FOR ADOPTION WITHOUT THE CONSENT OF THE FATHER.
 ¶ 25 The father argues that the trial court erred in finding that the adoption could proceed, pursuant to 10 O.S. 2001 § 7505-4.2[10-7505-4.2](C),[22] without his consent because he did provide support during the term of the pregnancy. The mother insists that not only did the father fail to support her during the pregnancy, but that his actions showed no *Page 1108 
inclination whatsoever to support her or the child regardless of his belief that she miscarried.
 ¶ 26 Title 10 O.S. 2001 § 7505-4.2[10-7505-4.2] provides in pertinent part:
 ". . . C. Consent to adoption is not required from a father or putative father of a minor born out of wedlock if:
 1. The minor is placed for adoption within ninety (90) days of birth, and the father or putative father fails to show he has exercised parental rights or duties towards the minor, including, but not limited to, failure to contribute to the support of the mother of the child to the extent of his financial ability during her term of pregnancy . . ."
 ¶ 27 The evidence reflects that: 1) the father acknowledged paternity and was pleased at the prospect of becoming a father; 2) the mother lived with him and his mother during a significant portion of the pregnancy; 3) the father quit school and obtained a job in preparation for one day providing for the family; 4) the father was allowed to believe for several months that the mother had miscarried the baby; 5) it was not physically evident that the mother was even pregnant until approximately after the sixth month of the pregnancy; 6) the father attempted to make contact with the baby at the hospital when the child was born, but he was prevented from doing so by the mother and the hospital staff; and 7) after the child's birth, the father sent some money to the mother's attorney for child related expenses.
 ¶ 28 The standard of review for a trial court's conclusion regarding a child's eligibility for adoption without the consent of the biological parent is whether it is supported by the clear weight of the requisite clear and convincing evidence.[23]
The clear weight of the clear and convincing evidence reflects that, although no specific monetary support was given directly to the mother,[24] the father met the minimal statutory requirements to the extent of his ability.[25] Even if the father had not met the minimal statutory requirements, it would seem incongruous to apply the statute when during the critical period — the term of pregnancy — he was allowed to believe that the mother was no longer pregnant.
 CONCLUSION ¶ 29 Legislative amendments to the Oklahoma Act, have expressly contradicted the application of the exception to Indian child custody proceedings in Oklahoma. Therefore, we determine that: 1) the "existing Indian family exception" is no longer a viable doctrine applicable in Oklahoma insofar as Indian child custody proceedings are concerned; and 2) even if it were, the evidence is insufficient to support a finding that the child was eligible for adoption without the consent of the father.
CERTIORARI PREVIOUSLY GRANTED; COURT OF CIVIL APPEALS OPINIONVACATED; TRIAL COURT REVERSED; CAUSE REMANDED. *Page 1109 
WATT, C.J., OPALA, V.C.J., KAUGER, EDMONDSON, COLBERT JJ., concur.
LAVENDER, HARGRAVE, WINCHESTER, TAYLOR, JJ., dissent.
[1] Title 10 O.S. 2001 § 7505-4.2[10-7505-4.2](C), see note 22, infra.
[2] Rye v. Weasel, 934 S.W.2d 257, 260 (Ky. 1996) [The Act was inapplicable to custody proceeding brought in connection with divorce of foster parents where there was no disruption of an existing Indian family unit.]; In the Matter of Crews,118 Wash.2d 561, 825 P.2d 305, 310 (1992) [Voluntary placement for adoption by mother did not constitute existing Indian family unit or environment from which the child was removed.]; In the Matterof Adoption of T.R.M., 525 N.E.2d 298, 302 (Ind. 1988) cert.denied, J.Q. v. D.R.L., 490 U.S. 1069, 109 S.Ct. 2072,104 L.Ed.2d 636 (1989) [The ICWA should not be applied to child who lived seven years in non-Indian culture because the purpose and intent of Congress could not be achieved.]. In the Matter ofAdoption of Baby Boy L, 231 Kan. 199, 643 P.2d 168, 174 (1982) [Act did not apply to adoption proceeding involving non-Indian mother of illegitimate child who had never been in care or custody of putative father and never part of Indian family.]. See also, In the Matter of T.S., 245 Mont. 242, 801 P.2d 77, 81
(1990), cert. denied, King Island Native Community v. MontanaDept. of Family Services, 500 U.S. 917, 111 S.Ct. 2013,114 L.Ed.2d 100 (1991) [Refusing to transfer jurisdiction where no contact with the tribe existed.].
A few appellate or other courts have also rejected the doctrine's application. In re Adoption of Baby Girl S.,181 Misc.2d 117, 690 N.Y.S.2d 907, 913 (N.Y. 1999) [Act did not apply to non-Indians adopting child of part-Indian mother where the mother failed to maintain significant social, cultural or political relationships with tribe.]; In re Hampton,658 So.2d 331, 336 (La.App. 1995), cert. denied J.A.L. v. Hampton,517 U.S. 1158, 116 S.Ct. 1549, 134 L.Ed.2d 651 (1996) [Act does not apply when Indian mother gave up child for adoption which would not cause breakup of existing Indian family or remove child from Indian environment.]; S.A. v. E.J.P., 571 So.2d 1187, 1189
(Ala.App. 1990) [Act inapplicable to cause involving Indian father who did not acknowledge paternity and non Indian mother where no effort was made to raise child in Indian culture.]; Inthe Interest of S.A.M., 703 S.W.2d 603, 608 (Mo.App. 1986) [No Indian family or Indian custodian existed where Indian father never maintained custody and mother was non-Indian.].
[3] In the Matter of S.C., 1992 OK 98, ¶ 38, 833 P.2d 1249;In the Matter of Adoption of Baby Boy D, 1985 OK 93, ¶ 26,742 P.2d 1059, cert. denied by Harjo v. Duello, 484 U.S. 1072,108 S.Ct. 1042, 98 L.Ed.2d 1005 (1988); In the Matter ofAdoption of D.M.J., 1985 OK 92, ¶ 12, 741 P.2d 1386.
[4] The father asserts that the utilization of the exception is precluded by recent statutory amendments. Title 10 O.S. 2001 § 40.1[10-40.1] provides:
 "The purpose of the Oklahoma Indian Child Welfare Act is the clarification of state policies and procedures regarding the implementation by the State of Oklahoma of the federal Indian Child Welfare Act, P.L. 95-608. It shall be the policy of the state to recognize that Indian tribes and nations have a valid governmental interest in Indian children regardless of whether or not said children are in the physical or legal custody of an Indian parent or Indian custodian at the time state proceedings are initiated. It shall be the policy of the state to cooperate fully with Indian tribes in Oklahoma in order to ensure that the intent and provisions of the federal Indian Child Welfare Act are enforced."
Title 10 O.S. 2001 § 40.3[10-40.3] provides in pertinent part:
 "A. The Oklahoma Indian Child Welfare Act, in accordance with the federal Indian Child Welfare Act applies to all child custody proceedings involving any Indian child except the following:
 1. A child custody proceeding arising from a divorce proceeding;
 or
 2. A child custody proceeding arising from an adjudication of delinquency, unless there has been a request for termination of parental rights.
 B. Except as provided for in subsection A of this section, the Oklahoma Indian Child Welfare Act applies to all state voluntary and involuntary child custody court proceedings involving Indian children, regardless of whether or not the children involved are in the physical or legal custody of an Indian parent or Indian custodian at the time state proceedings are initiated. . . ."
[5] The actual date of conception was disputed and demonstrated by conflicting evidence presented by both sides. At trial, the mother suggested that she conceived the child just before her sixteenth birthday; however, the evidence also suggests that it was after her birthday. Regardless, the precise day of conception is not determinative of the issues presented.
[6] The record reflects that the father never lived within the tribal boundaries of the tribe; he has not received the tribal newsletter because of his residence; he has attended approximately three tribal dances during his lifetime; and his family does not regularly participate in tribal activities.
[7] Both parents are from Seminole County, Oklahoma. The mother initially attempted to bring the action in Oklahoma County District Court, until it was determined that the Oklahoma County District Court never obtained proper jurisdiction over the parties or the subject matter. The father sought and obtained an ex parte temporary custody order in the Seminole County District Court which was conditioned upon either a determination by the District Court of Oklahoma County that it did not have jurisdiction or a denial of the mother's request for termination of the father's parental rights. Ultimately, the mother brought this action in Cleveland County, Oklahoma.
[8] Title 10 O.S. 2001 § 7505-4.2[10-7505-4.2] provides in pertinent part:
 ". . . C. Consent to adoption is not required from a father or putative father of a minor born out of wedlock if:
 1. The minor is placed for adoption within ninety (90) days of birth, and the father or putative father fails to show he has exercised parental rights or duties towards the minor, including, but not limited to, failure to contribute to the support of the mother of the child to the extent of his financial ability during her term of pregnancy . . ."
[9] A hearing in the cause was conducted on October 3 and 10, 2003. The trial court noted that it incorrectly chose the applicable law in its original order issued September 5, 2003. The court found that it incorrectly cited 10 O.S. 2001 § 7505-4.2[10-7505-4.2](C)(2) when it should have cited 10 O.S. 2001 § 7505-4.2[10-7505-4.2](C)(1), see note 8, supra.
[10] Title 25 U.S.C. § 1901, et seq.
[11] Title 25 U.S.C.A. § 1901 provides in pertinent part:
 "Recognizing the special relationship between the United States and the Indian tribes and their members and the Federal responsibility to Indian people, the Congress finds —
 . . . (4) that an alarmingly high percentage of Indian families are broken up by the removal, often unwarranted, of their children from them by nontribal public and private agencies and that an alarmingly high percentage of such children are placed in non-Indian foster and adoptive home and institutions; and
 (5) that the States, exercising their recognized jurisdiction over Indian child custody proceedings through administrative and judicial bodies, have often failed to recognize the essential tribal relations of Indian people and the cultural and social standards prevailing in Indian communities and families."
[12] Title 25 U.S.C.A. § 1902 provides:
 "The Congress hereby declares that it is the policy of this Nation to protect the best interests of Indian children and to promote the stability and security of Indian tribes and families by the establishment of minimum Federal standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes which will reflect the unique values of Indian culture, and by providing for assistance to Indian tribes in the operation of child and family service programs."
[13] Title 25 U.S.C.A. § 1903 provides:
 "For the purposes of this chapter, except as may be specifically proved otherwise, the term —
 (1) `child custody proceeding' shall mean and include — . . .
 (ii) `termination of parental rights' which shall mean any action resulting in the termination of the parent-child relationship;
 (iii) `preadoptive placement' which shall mean the temporary placement of an Indian child in a foster home or institution after the termination of parental rights, but prior to or in lieu of adoptive placement; and
 (iv) `adoptive placement' which shall mean the permanent placement of an Indian child for adoption, including any action resulting in a final decree of adoption.
 Such term or terms shall not include a placement based upon an act which, if committed by an adult, would be deemed a crime or upon an award, in a divorce proceeding, of custody to one of the parents.
 . . .
 (3) `Indian' means any person who is a member of an Indian tribe, . . .
 (4) `Indian child' means any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe; . . .
 (9) `parent' means any biological parent or parents of an Indian child . . . It does not include the unwed father where paternity has not been acknowledged or established. . . ."
[14] Title 25 U.S.C.A. § 1912 provides in pertinent part:
 ". . . (f) Parental rights termination orders; evidence; determination of damage to child
 No termination of parental rights may be ordered in such proceeding in the absence of a determination, supported by evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child."
[15] Title 25 U.S.C.A. § 1915 provides in pertinent part:
 ". . . (d) Social and cultural standards applicable
 The standards to be applied in meeting the preference requirements of this section shall be the prevailing social and cultural standards of the Indian community in which the parent or extended family resides or with which the parent or extended family members maintain social and cultural ties. . . ."
[16] Title 25 U.S.C. § 1921 provides:
 "In any case where State or Federal law applicable to a child custody proceeding under State or Federal law provides a higher standard of protection of the rights of the parent or Indian custodian of an Indian child than the rights provided under this subchapter, the State or Federal court shall apply the State or Federal standard."
[17] Title 10 O.S. 2001 § 40[10-40], et seq.
[18] Title 10 O.S. 2001 § 40.1[10-40.1], see note 4, supra; Title 10 O.S. 2001 § 40.3[10-40.3], see note 4, supra.
[19] Just prior to Mississippi Band of Choctaw Indians v.Holyfield, 490 U.S. 30, 109 S.Ct. 1597, 104 L.Ed.2d 29 (1989), this Court in 1985, decided In the Matter of the Adoption ofD.M.J., 1985 OK 92, 741 P.2d 1386 and In the Matter of Adoptionof Baby Boy D, 1985 OK 93, ¶ 26, 742 P.2d 1059, cert. denied
by Harjo v. Duello, 484 U.S. 1072, 108 S.Ct. 1042,98 L.Ed.2d 1005 (1988) on the same day. In both causes, we determined that the federal Act would not apply, unless the child was being removed from the custody of an Indian parent or from an Indian environment. In D.M.J., supra, an Indian father had challenged the adoption of his child. The child had been awarded to the non-Indian mother in a divorce proceeding nearly 10 years earlier. Although the Court determined that the federal Act did not apply to divorce proceedings [The only two Indian child proceedings excluded from the ambit of the Acts are custody provisions of a divorce decree and delinquency proceedings. Inthe Matter of Guardianship of Q.G.M., 1991 OK 29, ¶ 7,808 P.2d 684.], it also recognized that the Act would not control anyway because of the absence of an attempt to break-up an Indian family or an interruption in the continued custody by the Indian parent. The challenge of an adoption by an unwed Indian father was involved in Baby Boy D, supra. The Court noted that the federal Act was applicable only when confronted with the removal of Indian children from their families — when Indian children were being removed from their existing Indian environment. This Court held that the father had no standing to invoke the Act because he never had custody of the child and had not acknowledged or established paternity before the adoption.
[20] Prettyman v. Halliburton Co., 1992 OK 63, ¶ 21,841 P.2d 573; Huff v. State, 1988 OK 118, ¶ 4, 764 P.2d 183;Poafpybitty v. Skelly Oil Co., 1964 OK 162, ¶ 14,394 P.2d 515.
[21] We note that although the United States Supreme Court has yet to decide the issue, a split of authority exists. Some jurisdictions recognize the exception. Rye v. Weasel, see note 2, supra; In the Matter of Crews, see note 2, supra; In theMatter of Adoption of T.R.M., see note 2, supra; In the Matterof Adoption of Baby Boy L, see note 2, supra. See also, In theMatter of T.S., see note 2, supra; In re Adoption of Baby GirlS., see note 2, supra; In re Hampton, see note 2, supra; S.A.v. E.J.P., see note 2, supra; In the Interest of S.A.M., see note 2, supra. Others decline to do so. In the Interest ofA.B., 2003 ND 98, 663 N.W.2d 625, 635 (2003) cert. denied,Hoots ex rel. A.B. v. K.B., ___ U.S. ___, 124 S.Ct. 1875,158 L.Ed.2d 466 (2004) [Rejecting existing Indian family exception to termination of parental rights because it is contrary to the plain language of the Act and thwarts the tribe's interest.]; Inthe Matter of Baby Boy Doe, 123 Idaho 464, 849 P.2d 925, 930
(1993) cert. denied, Swenson v. Oglala Sioux Tribe,510 U.S. 860, 114 S.Ct. 173, 126 L.Ed.2d 133 (1993) [Act applicable to termination of parental rights because United State Supreme Court has effectively undermined the imposition of the doctrine and it conflicts with express provisions of the Act.]; In the Matter ofAdoption of Baade, 462 N.W.2d 485 (S.D. 1990) [Rejecting prior opinion in which the Court applied the doctrine and recognizing it was inconsistent with the Act and the United States Supreme Court decision in case involving termination of parental rights of 14 year old father.]; In the Matter of Adoption of T.N.F.,781 P.2d 973, 977 (Alaska 1989), cert. denied Jasso v. Finney,494 U.S. 1030, 110 S.Ct. 1480, 108 L.Ed.2d 616 (1990) [Applying the exception to mother of Indian child attempting to set aside adoption would undermine tribe's interest and the children as well as contradict the Act's plain language.]; In the Matter ofAdoption of A Child of Indian Heritage, 111 N.J. 155,543 A.2d 925, 932 (1988) [Act applied to voluntarily relinquished child for adoption regardless of whether child ever lived in Indian environment or with Indian family.].
Additionally, several state appellate courts have also rejected the doctrine's application. In re Michael J, Jr.,198 Ariz. 154, 7 P.3d 960, 963 (Ct.App. 2000) [Rejecting the doctrine as applied to putative father because not only is goal preserving Indian families, but also protecting tribe's interest and maintenance of its culture; the Act contains no such requirement or exception; legislative history support no imposition of doctrine; the United States Supreme Court has effectively undermined the doctrine's imposition; and the court already implicitly rejected it.]; State in Interest of D.A.C.,933 P.2d 993, 999 (1997 Utah App.) [Reasoning rejecting existing Indian family doctrine persuasive as applied to adoption of father's part-Indian children.]; In re Elliott, 218 Mich.App. 196,554 N.W.2d 32, 35 (1996) [Adopting view which rejects the existing Indian family exception to termination of parental rights of Indian mother and non-Indian father.].
Another court has expressly refused to adopt or reject the doctrine. In the Matter of Catholic Charities and CommunityServices, 942 P.2d 1380, 1381 (Colo.App. 1997) [Resolution of the question of application of the doctrine requires resolution of fact issues.]. Finally, some courts view it as a possible constitutional infringement. California Courts of Appeals in Inre Santos Y, 92 Cal.App.4th 1274, 112 Cal.Rptr.2d 692, 731 (2001) and In re Bridget R., 41 Cal.App.4th 1483,49 Cal.Rptr.2d 507, 529 (1996) cert. denied Cindy R. v. James R.,519 U.S. 1060, 117 S.Ct. 693, 136 L.Ed.2d 616 (1997) have determined that a refusal to apply the existing Indian family exception to the federal Act would result in an unconstitutional application. However, the North Dakota Supreme Court in In theInterest of A.B., supra., explicitly rejected the unconstitutional arguments and the California court's analysis. Although the United States Supreme Court did not specifically address the viability of the "existing Indian family exception" in Mississippi Band of Choctaw Indians v. Holyfield,490 U.S. 30, 109 S.Ct. 1597, 104 L.Ed.2d 29 (1989), the 10th Circuit Court of Appeals in Morrow v. Winslow, 94 F.3d 1386 (10th Cir. 1996),cert. denied 520 U.S. 1143, 117 S.Ct. 1311, 137 L.Ed.2d 475
(1997), rejected its underlying rationale. In rejecting the rationale behind those state court decisions, the Court recognized that the purpose of the Act is to protect the rights of Indian parents, children and tribes. It determined that the federal Act provided a cause of action for the father without regard to whether the child was removed from his custody — ie., an "existing Indian family." Clearly the 10th Circuit questions the exception's viability as applied to the federal Act.
[22] Title 10 O.S. 2001 § 7505-4.2[10-7505-4.2](C) provides:
 "Consent to adoption is not required from a father or putative father of a minor born out of wedlock if:
 1. The minor is placed for adoption within ninety (90) days of birth, and the father or putative father fails to show he has exercised parental rights or duties towards the minor, including, but not limited to, failure to contribute to the support of the mother of the child to the extent of his financial ability during her term of pregnancy; or
 2. The minor is placed for adoption within fourteen (14) months of birth, and the father or putative father fails to show that he has exercised parental rights or duties towards the minor, including, but not limited to, failure to contribute to the support of the minor to the extent of his financial ability, which may include consideration of his failure to contribute to the support of the mother of the child to the extent of his financial ability during her term of pregnancy. Failure to contribute to the support of the mother during her term of pregnancy shall not in and of itself be grounds for finding the minor eligible for adoption without such father's consent.
 The incarceration of a parent in and of itself shall not prevent the adoption of a minor without consent."
[23] White v. Adoption of Baby Boy D, 2000, OK 44, ¶ 35,10 P.3d 212; Matter of Adoption of R.W.S., 1997 OK 148, ¶ 10,951 P.2d 83; Matter of Adoption of J.L.H., 1987 OK 25, ¶ 12,737 P.2d 915.
[24] The mother likens the father's behavior to that of the fathers in In the Matter of Adoption of Baby Boy D, see note 3, supra and In the Matter of Adoption of Baby Girl M, 1997 OK CIV. APP. 33, 942 P.2d 235. The unwed biological father in BabyBoy D, supra, failed to provide any type of support for the mother during the pregnancy; failed to offer to marry her; made no attempt to learn when and where the child was born; never told his family she was pregnant; failed to pay expenses related to birth; did not attempt contact with the child; and never told the mother he wanted the child until the suit was filed. The father in Baby Girl M, supra, failed to provide any type of support during the pregnancy; failed to acknowledge paternity; failed to contribute to the mother's living or medical expenses during pregnancy; and failed to offer to support the baby after the birth. We find the mother's arguments of similarities of the fathers unconvincing because, here, unlike the father in BabyBoy D, supra, and Baby Girl M, supra, evidence reflects that the father met the minimal statutory requirements by grasping his parental rights and exercising his parental duties to the extent of his ability.
[25] See, e.g., In the Matter of Adoption of J.L.H., see note 23, supra.