2011 OK CIV APP 112

In the Matter of E.P.F.L., JR., H.R.S.L. and J.J.L., Deprived Children.

Erik Lane, Appellant,

v.

State of Oklahoma, Appellee.

No. 108,747.

Court of Civil Appeals of Oklahoma, Division No. 2.

Sept. 14, 2011.

Lisa M. Bohannan, The Bohannan Law Office, P.C., Pryor, Oklahoma, for Appellant.

Charles A. Ramsey, Assistant District Attorney, Pryor, Oklahoma, for Appellee.

Terry D. Allen, Jr., Terry D. Allen, Jr., Attorney at Law, PLLC, Pryor, Oklahoma, for the Children.

JANE P. WISEMAN, Judge.

¶1 Erik Lane, Sr. (Father), appeals from an order of the trial court upon jury verdict terminating his parental rights to his minor children, EPFL, Jr., HRSL, and JJL (the Children). Father raises the following issues on appeal: (1) whether the trial court erred in overruling his demurrer and finding that the State of Oklahoma met its burden to prove that active efforts had been made to prevent the breakup of this Indian family, and (2) whether the trial court erred by refusing to invoke the rule of sequestration.[1] After reviewing the record and applicable law, we find the trial court did not err in overruling the demurrer or in refusing to invoke the rule of sequestration as to an expert witness. Accordingly, we affirm the order of the trial court.

## FACTS AND PROCEDURAL BACKGROUND

¶2 On August 17, 2009, State filed a petition alleging EPFL, Jr., HRSL, and JJL "became deprived by reason the children do not have the proper parental care or guardianship." State alleged that Father and Jimy Rabbit (Mother) "had been in a physical altercation whereby both sustained injury." The petition stated, "Both parents consume alcohol to the point of intoxication. [Father] has a pending case involving violence towards [Mother] and is currently on a deferred sentence for Assault and Battery with a Dangerous weapon involving [Mother]." State also claimed Mother had suicidal thoughts and she was in the hospital because she was detained as a person who was "in need of mental health treatment." The children's home was in deplorable condition because of cockroaches, dirty dishes, rotting food, and a strong foul odor. State alleged that the Children had previously been adjudicated deprived "for similar issues including inadequate housing and physical violence between the parents." Both Father and Mother stipulated to the State's allegations on October 13, 2009, and the court adjudicated the children deprived.

¶3 The court set a dispositional hearing for November 24, 2009. At the time of the dispositional hearing, Father was in jail. Father had been in jail since October 22, 2009, for charges relating to domestic violence against Mother. At the November 24th hearing, Father and Mother signed a treatment plan. The treatment plan required Father to complete a substance abuse assessment, follow the recommendations made in the assessment, submit to random UAs, and sign necessary releases to the Department of Human Services (DHS) so it could communicate with the agency providing services to Father regarding his progress.

¶4 The plan also required Father to complete a domestic violence assessment, follow all recommendations made in the assessment, and sign any necessary releases so that DHS could track his progress. Father was also required to complete the recommendations of his mental health review, provide a safe home for the children, provide financially for the children through legal means, complete a budgeting class, and prepare and submit a budget to DHS. In the event the children were returned home, the plan required Father to actively participate in a home-based services program. Father was also required to comply with a visitation schedule and keep in contact with his DHS worker.

---

1. Although Father listed a third proposition in his petition in error—that the trial court erred in denying Father's motion in limine and admitting evidence of Father's pending criminal charges— this proposition was not argued in Father's brief, and pursuant to Supreme Court Rule 1.11(k)(1), this issue is deemed waived. Oklahoma Supreme Court Rule 1.11(k)(1), 12 O.S. Supp.2010 ch. 15, app. 1.

¶ 5 On May 10, 2010, State filed a motion to terminate Father's parental rights on the ground that Father failed to correct the conditions which led to the deprived adjudication after he had been given at least three months to correct those conditions. Mother had previously relinquished her parental rights. A trial was held on August 3 and 4, 2010.

¶ 6 At trial, State introduced evidence that it filed a petition to adjudicate the Children deprived in January 2007. In the first deprived petition, State alleged the children did not have proper parental care because Mother and Father were under the influence of alcohol while caring for them. Mother and Father "got into a physical altercation in the children's presence such that both parties received injury." The petition noted Father had been previously arrested for domestic violence and, at the time the petition was filed, Father had a pending case involving domestic violence towards Mother. The petition alleged the Children's home was an unfit place to live because it was dirty, had broken plates and glass within reach of the children, and the refrigerator was broken and had rotting food in it. Also, "the children were dirty, unkempt, and had a foul odor about their person."

¶ 7 Mother and Father stipulated to the first deprived petition and the Children were adjudicated deprived on February 22, 2007. Mother and Father signed a treatment plan on March 6, 2007. The plan required Father to obtain psychological, domestic violence, and drug and alcohol assessments and follow all recommendations; attend and complete parenting classes; make sure the Children had adequate food, proper clothing, and housing; participate in home-based services; follow a visitation plan; sign releases to allow DHS to share information with other agencies; and keep in contact with his case worker.

¶ 8 Scott Oliver, a permanency planner for DHS, testified he was assigned to Father's and Mother's case in February 2007. In regard to the first treatment plan, Oliver referred Father to Safenet for a domestic violence assessment, but as far as he knows, Father did not complete the assessment. Father did complete a drug and alcohol assessment. Although Father attended parenting classes, he did not complete them. Father and Mother did obtain adequate housing, food, and clothing for the Children. Father obtained a psychological evaluation in July or August 2007. The Children were not returned to Father and Mother while Oliver had the case because they had not completed the treatment plan. Father and Mother continued to have issues with alcohol and domestic violence. Oliver stated that he "knew of at least two times that [Father] was arrested for public intox, [and] another time where [Mother and Father] were arrested for domestic violence and public intox during the six months" he was their permanency planner. Oliver testified Father was still receiving alcohol treatment while he had the case.

¶ 9 Debra Morgan, also a permanency planner for DHS, received Father's and Mother's case in January 2008. When Morgan received the case, Father was in jail for domestic battery and assault with a dangerous weapon on Mother. Morgan did not know when Father was placed in jail, but he was released on April 1, 2008. Father received the required drug and alcohol assessment on February 13, 2007, which resulted in a recommendation that Father obtain 12 weeks of "drug and alcohol services and a deferred six-week[s] of anger management and if . . . domestic abuse happened, then he would complete the six weeks." Father did not complete the recommended services. Although Father had the opportunity to attend the drug and alcohol classes at People, Inc., he did not do so. Father had another substance abuse assessment on April 30, 2008, which recommended 12 weeks of substance abuse group therapy and 12 weeks of self-help group therapy. Father did complete the second set of recommendations. Father also completed parenting classes at Safenet. Morgan stated Father did not have a house of his own but he helped Mother provide a home for the Children.

¶ 10 The Children were returned to Mother on June 17, 2008, because she had completed her treatment plan. Father was not living with Mother at that time because "[h]e still had items to complete on his treatment plan." Although the Children were returned

in June 2008, the deprived child case was not closed until April 2009. Morgan stated that she was going to close the case earlier, but Mother had a public intoxication charge in December 2008. Morgan again attempted to close the case early in 2009, but when she made an unannounced visit to Mother's home, Father was there watching the Children and the home was dirty. Morgan told Father he needed to clean up the home. When Morgan came back the next week, the home was cleaner than on her previous visit. Morgan stated Father had completed all of the items on his treatment plan except for the anger management requirement.

¶ 11 Although the Children were returned to Mother in 2008 and the case was closed in April 2009, they were soon back in DHS custody. DHS took the Children back into its custody on August 10, 2009. Father testified the Children were removed because their "house was a mess" and Mother and Father were in a fight the night before and they both sustained injuries.

¶ 12 David Goff, a DHS permanency planner, testified the Children were removed for "[e]ssentially the same thing as before" including "substance abuse, domestic violence ... [and] a very dirty home, [that was] unsafe for the children." Goff testified that when he devised the second treatment plan, he did not do much differently except "[s]ort of fine-tune it somewhat, because in the previous treatment plans, it was indicated that anger management was needed instead of domestic violence." Goff specified that "domestic violence assessments had to be completed" rather than one for anger management.

¶ 13 Goff testified that after he drafted the treatment plan, he made a referral for Father to the Rogers County Drug Abuse Program. Goff stated he provided Mother and Father with gas vouchers to go to the Rogers County Drug Abuse Program, but Father did not go. However, he later found out Father was arrested the day after he gave Father the voucher.

¶ 14 At the time Goff conducted a strengths/needs assessment, Father did not have his own home and he was living with family and friends. At the time of trial,

Father was living with his father and stepmother and their home is not an appropriate place for the Children because Father's father is a registered sex offender. Father has not been employed since his release from jail in May 2010 and had not been employed before being placed in jail in October 2009. Since Father was released from jail, he has visited the Children when he was scheduled to do so except for two times when he had appointments. Father signed the required releases to enable DHS to share information about his case. Although Father did not contact Goff until several weeks after he was released from jail, he has been in regular contact with Goff since that time.

¶ 15 Goff testified Father could not receive drug and alcohol treatment while he was in jail, but he did start treatment at a facility named Wind Horse on May 21, 2010. Father started domestic violence treatment on July 14, 2010. The domestic violence treatment takes 52 weeks to complete. At the time of trial, Father had 50 more weeks before he could complete his treatment for domestic violence. Goff stated that although Father has not completed everything on his treatment plan, "[h]e's beginning to." However, Father had not paid child support in almost a year and at the time of trial, he was $6,681.34 in arrears.

¶ 16 Goff testified Father has not corrected the conditions that led to the deprived adjudication because he has not made any significant progress on his treatment plan. Goff stated, "There was nothing I could provide him while he was in jail." Goff did visit Father at least once a month while he was in jail. Goff first recommended termination in March 2010, before Father was released from jail. Goff admitted that he thought Father was sober during the trial. Goff recommended Father's parental rights be terminated. Goff stated, "I feel the children are not safe in [Father's] presence."

¶ 17 Alayna Farris, a child welfare specialist for the Cherokee Nation, testified that DHS had performed active efforts to provide services to prevent the breakup of Father's family. Those efforts, however, were unsuccessful. Farris recommended termination of

Father's parental rights "[d]ue to the unsuccessful completion of the treatment plan, the length of this case, and that this is the second go-round with the children being in DHS custody." Farris recommended termination even in light of the new items on his treatment plan that Father had started to address. Farris stated, "The children need a safe environment to grow up in, they need parents that are willing to provide that safe environment free of substance abuse, free of violence, and that children can only be—you know, just in my opinion and the Cherokee Nation's opinion, children need to be raised free of all of those issues that are involved in this case." Farris also testified that it is the opinion of the Cherokee Nation that the return of the Children to Father's custody would likely result in serious physical or emotional harm to the Children.

¶ 18 At the close of State's evidence, Father demurred to the evidence, asserting State had failed to meet its burden as to the active efforts requirement. The trial court found State had presented evidence to meet the active efforts requirement and overruled Father's demurrer.

¶ 19 Father testified that he has been arrested at least four times for domestic violence against Mother. He was arrested on October 23, 2007, for assault and battery with a dangerous weapon and was released from jail on April 1, 2008. When the Children were removed from the home in 2009, Father was on a deferred sentence for that assault and battery. Father stated that at the time of trial, he still had criminal cases pending for a June 2009 domestic violence charge and one from October 2009.

¶ 20 Father claims he did not complete the anger management program required by the first treatment plan because DHS closed the first deprived case. He admitted he quit working on the first treatment plan. However, he testified he started working on the new plan as soon as he got out of jail and, at the time of trial, he had been sober for ten months.

¶ 21 The jury found by proof beyond a reasonable doubt that Father's parental rights to the Children should be terminated because Father failed to correct the conditions which led to them being adjudicated deprived. The trial court entered an order upon jury verdict terminating Father's parental rights.

¶ 22 Father appeals.

## STANDARD OF REVIEW

■ ¶ 23 Father contends the trial court erred in overruling his demurrer. Title 12 O.S.2001 § 577 provides, "The party on whom rests the burden of the issues must first produce his evidence; after he has closed his evidence the adverse party may interpose and file a demurrer thereto, upon the ground that no cause of action or defense is proved." If the court sustains the demurrer, "judgment shall be rendered for the party demurring as the state of the pleadings or the proof shall demand." *Id.* " 'A demurrer to the evidence should be overruled unless there is no competent evidence or reasonable inference from evidence tending to establish a cause of action.' " *Hopkins v. West,* 2009 OK CIV APP 104, ¶ 11, 229 P.3d 560, 563 (quoting *In re D.R.,* 2001 OK CIV APP 21, ¶ 10, 20 P.3d 166, 168).

■ ¶ 24 In order to ascertain if the trial court erred in overruling Father's demurrer, we must determine if State met its burden of proof to show that active efforts were made to provide remedial services to prevent the breakup of this Indian family. As a general rule, before parental rights may be severed, the State must prove its case by clear-and-convincing evidence. *In re S.B.C.,* 2002 OK 83, ¶ 5, 64 P.3d 1080, 1082. No one disputes that the Children are Indian children within the meaning of the Indian Child Welfare Act (ICWA) 25 U.S.C.A. §§ 1901–1963 (West 2001)[2] or that ICWA applies to this case. Where an Indian child is involved, however, "the proceedings must comply with the provisions of both the federal ICWA ... and its Oklahoma counterpart, the Oklahoma ICWA, 10 O.S.2001 [ & Supp.2010] §§ 40 through

---

2. "Indian child" is defined by 25 U.S.C.A. § 1903(4) (West 2001) as "any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe."

40.9." *In re T.L.*, 2003 OK CIV APP 49, ¶ 11, 71 P.3d 43, 46.

¶ 25 Father asserts the trial court should have sustained his demurrer because State failed to meet ICWA's "active efforts" requirement. Father's reference to "active efforts" is a reference to the requirement found at 25 U.S.C.A. § 1912(d) (West 2001), which provides the following:

> Any party seeking to effect a foster care placement of, or termination of parental rights to, an Indian child under State law shall satisfy the court that *active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family* and that these efforts have proven unsuccessful.

(Emphasis added.) "Section 1912(d)'s 'active efforts' requirement, for which the State has the burden of proof, is a *predicate* finding of the trial court made *before* a termination case may proceed." *In re J.S.*, 2008 OK CIV APP 15, ¶ 5, 177 P.3d 590, 591. There is not a definition of what comprises "active efforts" and the issue must therefore be determined on a case by case basis. *Id.* at ¶ 7, 177 P.3d at 592. Under Oklahoma law in cases not involving Indian children within the meaning of ICWA, "reasonable efforts" must be exercised by DHS to return children to their home. *Id.* at n. 3.

¶ 26 Father is correct that DHS was required to prove that it met ICWA's active efforts requirement before his parental rights could be terminated. Congress' intended purpose in passing ICWA was to protect Indian children and promote the stability and security of tribes and families by establishing minimum standards for the removal of Indian children from their homes. *Id.* at ¶ 12, 177 P.3d at 593. The Court noted that the majority of courts considering the issue have concluded that the "active efforts" standard is a higher standard for a social services department than the "reasonable efforts" standard under state laws. *Id.* at ¶ 14, 177 P.3d at 593. In light of the plain language of § 1912(d) and the policy behind ICWA, including the desire to achieve uniformity among states, the Court declined "to follow the minority and instead join[ed] the majority of other states' courts which have interpreted ICWA and held that the 'active efforts' standard requires more effort than the 'reasonable effort' standard in non-ICWA cases." *Id.* at ¶ 15, 177 P.3d at 593–94.

■ ¶ 27 In reviewing whether State met its burden, we must first determine which burden of proof applies in regard to the active efforts requirement. Under the federal ICWA, "[n]o termination of parental rights may be ordered in such proceeding in the absence of a determination, supported by evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child." 25 U.S.C.A. § 1912(f) (West 2001).[3] However, the Court of Civil Appeals has previously held the "beyond a reasonable doubt" standard of proof only applies to § 1912(f) determinations regarding emotional or physical damage to the child. In *In re J.S.*, 2008 OK CIV APP 15 at ¶ 4, 177 P.3d at 591, the Court stated the following:

> That heightened standard of proof, which is absent from the language of § 1912(d), [the section requiring active efforts] applies *only* to the factual determination required by 25 U.S.C. § 1912(f) to be made in ICWA termination cases, *i.e.*, "that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child," whereas the lesser standard of "clear and convincing" evidence, the state-

---

3. Because the ICWA is clear on this point, the language in *In the Matter of M.S.*, 2010 OK 46, ¶¶ 17–19, 237 P.3d 161, 167, a case involving the ICWA (although not a parental termination case), stating that the "clear and convincing evidence" standard is to be applied in parental termination cases in proving the potential for harm to the child caused by a parent's abuse or neglect does not appear appropriate. Here, State in its brief urges the application of the "clear and convincing evidence" standard, and Father cites what we believe to be the correct standard pursuant to § 1912(f), "evidence beyond a reasonable doubt" on the question of whether "continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child."

law mandated burden of proof, is applicable to all other state law requirements for termination.

Therefore, State was only required to prove by clear-and-convincing evidence that it made active efforts to provide remedial services and rehabilitative programs that were designed to prevent the breakup of this Indian family.

¶ 28 As to the issue of the rule of witness sequestration, an exception for expert witnesses is generally recognized and considered to be within the trial court's sound discretion. *Clark v. Continental Tank Co.,* 1987 OK 93, ¶ 8, 744 P.2d 949, 951. The *Clark* Court quoted *Lewis v. Owen,* 395 F.2d 537, 541 (10th Cir.1968):

> The general rule is that, notwithstanding a court order excluding witnesses from the court room during the presentation of evidence, it is within the sound discretion of the court to permit an expert witness to remain in the court room while other witnesses are testifying, and the court's action is reviewable only for abuse of discretion and prejudice to the complaining party.

(citations omitted). We will therefore review this proposition under the abuse of discretion standard.

## ANALYSIS

¶ 29 Father asserts on appeal that at the close of State's evidence, he "demurred to the evidence on the grounds that the State had failed to prove by clear and convincing evidence that active efforts had been made to prevent the breakup of this Indian family." The trial court overruled the demurrer finding that "active efforts to assist the father to correct the conditions that led to the children being adjudicated deprived were made by [DHS] over the last three years" and "further active efforts would be futile."

¶ 30 ICWA was enacted in response to a finding by Congress "that an alarmingly high percentage of Indian families are broken up by the removal, often unwarranted, of their children from them by nontribal public and private agencies and that an alarmingly high percentage of such children are placed in non-Indian foster and adoptive homes and institutions." 25 U.S.C.A. § 1901(4) (West

2001). Congress also found "that the States, exercising their recognized jurisdiction over Indian child custody proceedings through administrative and judicial bodies, have often failed to recognize the essential tribal relations of Indian people and the cultural and social standards prevailing in Indian communities and families." 25 U.S.C.A. § 1901(5) (West 2001). It is because of these concerns that ICWA requires that before parental rights can be terminated in cases involving Indian children, the State must show "active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful." 25 U.S.C.A. § 1912(d) (West 2001).

¶ 31 DHS cited 21 examples of active efforts it performed in Father's case. Father asserts these 21 examples include active efforts that were made in both of the deprived child cases. He claims that of the 21 active efforts, 8 were provided in the 2007 case. Of the remaining 13 active efforts, Father claims only three of them were provided to Father—a gas voucher, a referral to Rogers County Drug Abuse, and transportation of the Children to the jail to visit Father.

¶ 32 We do not agree with Father's contention that the trial court erred in overruling Father's demurrer to State's evidence of active efforts. The trial court found DHS had provided active efforts and that further active efforts would be futile. After reviewing the record, we find this ruling to be correct.

¶ 33 First, it was not improper for DHS to rely on the active efforts made in the prior deprived adjudication. Those active efforts were not so remote in time as to make them inapplicable. The remedial services provided in the prior case were designed to remedy the same problems that are at issue in this case.

¶ 34 If there have been multiple cases, the remedial services offered to parents in a termination case do not all have to be offered in the current case. For example, in *In re T.H., M.B., and J.M.B.,* 2005 OK CIV APP 5, ¶ 16, 105 P.3d 354, 358, the Court of Civil Appeals found that remedial services would

have been futile when a mother had been through a previous treatment plan in another state. The previous plan had been imposed on the mother after her son was removed from her home because she had continued to allow his father to live in the home despite the fact that he had been convicted of severely abusing his own son. *Id.* After the family had moved to Oklahoma, the mother arrived home one day to find their daughter limp and a large bruise on her head. *Id.* at ¶ 6, 105 P.3d at 355. The mother took the daughter to the hospital, left her there, and did not return for her or call to check on her. *Id.* at ¶¶ 6–7, 105 P.3d at 355. The Court found no error in the failure to provide further remedial services. *Id.* at ¶ 16, 105 P.3d at 359. The Court also noted that the mother could not have completed a treatment plan because she had been incarcerated for the entirety of the proceedings. *Id.* at n. 8.

¶ 35 The *T.H.* Court also stated, "In *People ex rel. D.G.,* 679 N.W.2d 497, 502 (S.D. 2004), the court noted that a parent's incarceration does not excuse the state from offering remedial services, but the court noted that incarceration may limit the state's ability to afford remedial services." *Id.* at n. 8. In *D.G.,* the Supreme Court of South Dakota recognized that a parent's incarceration limits the Department of Social Services' ability to attempt to rehabilitate the family. *People ex rel. D.G.,* 679 N.W.2d 497, 502 (S.D.2004). The South Dakota Court stated that the reality is that when "determining a parent's fitness the fact of incarceration cannot be ignored." *Id.* The *D.G.* court concluded the Department of Social Services could not "be faulted for [the] father's criminal choice which limited its ability to return the child" and concluded that the Department's "efforts were active and reasonable." *Id.*

¶ 36 In *A.A. v. State of Alaska,* 982 P.2d 256, 261 (Alaska 1999), the Supreme Court of Alaska was asked to determine whether the State of Alaska had met its burden of proof that active efforts had been made to provide remedial services for an Indian family where the father was incarcerated. The Court stated:

A parent's incarceration significantly affects the scope of the active efforts that the State must make to satisfy the statutory requirement. While "[n]either incarceration nor doubtful prospects for rehabilitation will relieve the State of its duty under ICWA to make active remedial efforts," the practical circumstances surrounding a parent's incarceration—the difficulty of providing resources to inmates generally, the unavailability of specific resources, and the length of incarceration—may have a direct bearing on what active remedial efforts are possible. Thus, while the State cannot ignore its ICWA duties merely because of [the father's] incarceration, his incarceration is a significant factor in our evaluation of the adequacy of the State's efforts in this case.

*Id.* (footnotes omitted).

¶ 37 In *In re K.D.,* 155 P.3d 634, 637 (Colo.Ct.App.2007), a case involving the ICWA, a Colorado Court of Appeals concluded:

[A] court may terminate parental rights without offering additional services when a social services department has expended substantial, but unsuccessful, efforts over several years to prevent the breakup of the family, and there is no reason to believe additional treatment would prevent the termination of parental rights. *E.A. v. State Div. of Family & Youth Servs.,* 46 P.3d 986 (Alaska 2002); *see also People in Interest of J.S.B.,* [691 N.W.2d 611 (S.D. 2005)] (court could terminate parental rights without additional services when a social services department has worked with a family for several years, the child had been removed from parental custody three times because of substance abuse related neglect, and the parents continued to use drugs).

¶ 38 Father knew before he committed domestic violence in 2009 that this was exactly the type of activity that could result in the Children being removed from the home. Father knew this because the Children had previously been removed from the home in large part because of domestic violence. They were removed from the home in 2009 for the same reasons they were removed in 2007—Mother and Father drinking alcohol,

domestic violence, and an unsafe home environment.

¶ 39 Father cites his arrest and incarceration as a reason he did not complete the most recent treatment plan. Although he complains that no services were offered while he was incarcerated, Father's own actions—continued domestic violence—caused him to be incarcerated and unable to complete the treatment plan.

¶ 40 It is undisputed that Father began to work on his treatment plan after his release from jail. It is also undisputed that Father would not be able to complete the treatment plan until almost a year after the trial, which would be almost two years since the Children were last removed from the home, and almost four and one-half years from the time the Children were first removed from the home.

¶ 41 DHS has been providing services to this family since 2007. Father failed to complete his treatment plan and take full advantage of the services offered to him during the time the Children were first adjudicated deprived. After they were returned to Mother, and approximately four months after the first case was dismissed, State again removed the Children from the home for the very conditions that led to the first deprived adjudication. DHS then again tried to provide services to Father, but Father was placed in jail for domestic violence against Mother. DHS cannot be faulted for Father being placed in jail, a fact which limited DHS's ability to provide services to Father and to return the Children to him.

¶ 42 We conclude there is clear and convincing evidence that DHS made active efforts to provide remedial services and rehabilitative programs designed to prevent the breakup of this Indian family and that those efforts were unsuccessful. Accordingly, we find no trial court error in overruling Father's demurrer on the issue of active efforts.

■ ¶ 43 In his other proposition of error, Father argues that the trial court erred by refusing to invoke the rule of sequestration of witnesses after it was requested by Father's attorney to exclude State's witness Alayna Farris after noticing her presence in the courtroom. Title 12 O.S.2001 § 2615 provides, "At the request of a party the court shall order witnesses excluded so that they cannot hear the testimony of other witnesses." An "exception to the rule has widely been considered to be within the discretion of the trial court, and that is for an expert witness, testifying not as to the truthfulness of facts in controversy, but rendering an opinion based upon a stated or assumed set of facts." *Clark v. Continental Tank Co.*, 1987 OK 93, ¶ 8, 744 P.2d 949, 951. Oklahoma recognizes this exception. *Id.*

¶ 44 Alayna Farris was an expert witness for the purposes of ICWA. She rendered an opinion on behalf of the Cherokee Nation regarding whether active efforts had been provided and whether custody of the Children by Father would result in harm to the Children. Father argues in his brief that he was prejudiced by the trial court's refusal to exclude Farris because "the expert witness had the opportunity to formulate an opinion as to a critical element of the State's case by listening to the evidence provided at trial by the other witnesses and her opinion could have been influence[d] by the testimony of the other witnesses."

¶ 45 We do not view this as prejudicial—Section 2703 of the Oklahoma Evidence Code provides for such an occurrence. 12 O.S. Supp.2009 § 2703. "The facts or data in the particular case upon which an expert bases an opinion or inference *may be those perceived by* or made known to *the expert at* or before *the hearing.*" *Id.* (emphasis added). Any change in an expert's testimony based on evidence gleaned in the courtroom may, in the course of events, provide ammunition on cross-examination.

■ ¶ 46 Expert witnesses, as a recognized exception to the rule of sequestration, are allowed to remain in the courtroom in the trial court's discretion, both to have the benefit of courtroom testimony in rendering an expert opinion and for reasons of judicial economy—avoiding the repetition of others' testimony in questioning the expert and eliciting the expert's opinion. We find no abuse of discretion in allowing Farris as an expert witness to remain in the courtroom after the rule of sequestration had been requested.

## CONCLUSION

¶ 47 We conclude, upon review of the record, that the trial court properly overruled Father's demurrer and properly exercised its discretion in refusing to invoke the rule of sequestration to exclude an expert witness. The order of the trial court terminating Father's parental rights to EPFL, Jr., HRSL, and JJL is affirmed.

¶ 48 **AFFIRMED.**

BARNES, P.J., concurs, and FISCHER, V.C.J., concurs in part, dissents in part, and concurs in result.

FISCHER, V.C.J., concurring in part, dissenting in part and concurring in result.

¶ 1 I concur in part, concur in result and dissent only with respect to the burden of proof adopted by the Majority. I would apply the beyond-a-reasonable-doubt burden of proof to all elements that must be established to terminate Father's parental rights to these Indian children.

¶ 2 As noted by the Majority, this termination proceeding is governed by the Indian Child Welfare Act and specifically 25 U.S.C. § 1912. There are two things the ICWA required the State to prove before Father's parental rights could be terminated: (1) "Any party seeking to effect a ... termination of parental rights to, an Indian child under State law shall satisfy the court that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful," § 1912(d); and (2) "No termination of parental rights may be ordered in such proceeding in the absence of a determination, supported by evidence beyond

a reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child," § 1912(f). Although the Majority and another division of this Court, relying on well-established principles of statutory construction, conclude that Congress would have specified the beyond-a-reasonable-doubt standard for the active efforts element if it had intended that to be required, I am persuaded that one burden of proof is required in an Indian parental rights termination case.

¶ 3 This issue is discussed in C. Steven Hager, *The Indian Child Welfare Act: Case and Analysis,* § 1–111 (15th ed.2011). The author cites eight jurisdictions that apply the beyond-a-reasonable-doubt burden of proof to all ICWA elements of the termination case, and twelve jurisdictions that apply a bifurcated burden of proof as the Majority does in this case. According to the author, of the seven states with substantial Indian populations, Montana, New Mexico and South Dakota apply a unified burden of proof; Alaska, Arizona, North Dakota and Oklahoma use the bifurcated approach. The author includes Oklahoma among those states applying the bifurcated burden of proof based on *In re Adoption of R.L.A.,* 2006 OK CIV APP 138, ¶ 17, 147 P.3d 306, 310–11. In that case, the Court discussed the 2005 Introductory Comment to the Oklahoma Uniform Jury Instructions for Juvenile Cases (OUJI–Juv.), including the drafting committee's comment: "The prevailing practice in Oklahoma trial courts has been to use the reasonable doubt standard for both the state law requirements for termination of parental rights and the requirements in 25 U.S.C. § 1912(f)...." [1] The committee

---

1. The full comment is found at *In re Oklahoma Uniform Jury Instructions for Juvenile Cases,* 2005 OK 12, 116 P.3d 119, 163, and provides:

    Section 1912(f), *supra,* specifies a beyond a reasonable doubt standard of proof for termination of parental rights proceedings. A number of other jurisdictions use a dual standard of proof in ICWA cases in which a clear and convincing standard is applied to the state law requirements for termination of parental rights and the reasonable doubt standard is applied only to the requirement in 25 U.S.C. § 1912(f)

    that continued custody by the parent is likely to result in serious emotional or physical damage to the child. E.g., *In re H.A.M.,* 25 Kan. App.2d 289, 961 P.2d 716, 719 (1998). The prevailing practice in Oklahoma trial courts has been to use the reasonable doubt standard for both the state law requirements for termination of parental rights and the requirements in 25 U.S.C. § 1912(f), however. In addition, in *In the Matter of T.L.,* 2003 OK CIV APP 49, ¶ 15, 71 P.3d 43, the Oklahoma Court of Civil Appeals applied the reasonable doubt standard

reached its conclusion based on its reading of *In re T.L.*, 2003 OK CIV APP 49, 71 P.3d 43. The issue on appeal in the *T.L.* case was whether the district court erred in failing to grant the mother's demurrer to the State's evidence in her parental rights termination case. The Court first noted that the reasonable doubt standard was involved: "in ICWA cases, State must prove 'beyond a reasonable doubt' that continued custody by the parent is likely to result in serious emotional or physical damage to the child. 25 U.S.C. § 1912(f)." The Court then found no error in overruling the mother's demurrer because:

> [W]e find that State's evidence was sufficient to convince a rational juror beyond a reasonable doubt that Mother failed to correct the conditions leading to the deprived adjudication, that Children had been in foster care for 15 of the 22 months immediately preceding the filing of the termination proceedings, and that Children's emotional or physical safety and security would be jeopardized if Children were returned to Mother's custody.

*Id.* ¶ 15, 71 P.3d at 47. The *R.L.A.* Court was not persuaded that the holding in *T.L.* was so broad as to apply the reasonable doubt burden to all aspects of the termination case and to the extent that it was, the *R.L.A.* Court declined to follow that holding.[2] Regardless of how the holding in *T.L.* is characterized, it is clear that the Court applied the reasonable doubt standard to each of the three elements the State was required to prove in terminating Mother's parental rights.

¶ 4 After the *R.L.A.* decision, the Uniform Jury Instructions regarding ICWA cases were revised. *See In re Amendments to Oklahoma Uniform Jury Instructions for Juvenile Cases*, 2011 OK 23, —— P.3d ——,

entered March 24, 2011. The Introductory Comment now requires a bifurcated burden of proof to be applied.

The Oklahoma Court of Civil Appeals held in *In re Adoption of R.L.A.*, 2006 OK CIV APP 138, ¶ 15, 147 P.3d 306, 310, that the reasonable doubt "burden of proof provided in [25 U.S.C.] § 1912(f) applies only to the specific factual determination required by that section." The *R.L.A.* decision concluded that because it could not find a proper basis for imposing a higher standard of proof on the other issues in a termination case involving an Indian child than if the case did not involve an Indian child, the clear and convincing standard of proof applied to the state law requirements for termination of parental rights. *Id.* Appellate courts in Alaska, Arizona, Colorado, Kansas, Maine, Michigan, Nebraska, Nevada, New York, North Carolina, North Dakota, Utah, Washington, and Wisconsin have reached the same conclusion. *Valerie M. v. Arizona Dept. of Economic Sec.*, 219 Ariz. 331, 335, 198 P.3d 1203, 1207 (Ariz. 2009) ("[N]early every other state court that has considered this issue has concluded that ICWA allows states to specify the standard of proof for state-law findings distinct from the findings required by ICWA."); *In re N.J.*, 221 P.3d 1255, 1260–61 (Nev.2009); *In re Termination of Parental Rights to Daniel R.S.*, 286 Wis.2d 278, 321, n. 6, 706 N.W.2d 269 (2005). Accordingly, Juvenile Instruction No. 5.2 states that there are two standards for the burden of proof for termination of parental rights, defines the clear and convincing evidence standard, and then states that the reasonable doubt standard of proof is a higher standard of proof. In addition, Juvenile Instruction 5.3 incorporates the ap-

---

to both the requirements in 25 U.S.C. § 1912(f) and the Oklahoma state law requirements that the parent failed to correct conditions leading to adjudication and that the child had been in foster care for 15 of the 22 months preceding the filing of the termination proceedings. Using the reasonable doubt standard for both the state law requirements and the requirements in 25 U.S.C. § 1912(f) avoids the difficulty of explaining different standards of proof to the jury, and is therefore less confusing to the jury. Applying the higher reasonable doubt standard also gives greatest effect to the ICWA, and it is

therefore less likely to result in reversal of a termination of parental rights decision than applying the lower clear and convincing evidence standard. Accordingly, the reasonable doubt standard is used in these instructions for both the state law requirements and the requirements in 25 U.S.C. § 1912(f).

2. This position was reaffirmed in *In re J.S.*, 2008 OK CIV APP 15, ¶ 4, 177 P.3d 590, 591, the case cited by the Majority.

plicable Oklahoma grounds for termination of parental rights and then sets forth the additional requirement of proof beyond a reasonable doubt, including the testimony of at least one expert witness that continued custody of the child by the parent or legal custodian is likely to result in serious emotional or physical damage to the child. OUJI—Juv., ch. 5, "Indian Child Welfare Act–Introductory Note." The Order adopting these amendments also accepted and authorized the updated committee comments and user notes to be published with the amendments. However, the Order has not been released for publication and is subject to revision or withdrawal. Further: "As it has done previously, the Court [declined] to relinquish its constitutional or statutory authority to review the legal correctness of these authorized instructions when it is called upon to afford corrective relief in any adjudicative context." *Id.* ¶ 4. The Supreme Court may resolve the conflict between *R.L.A.* and the *T.L.* approach by adopting a bifurcated burden of proof, but it has yet to do so. A recent decision, as well as existing law suggest, in my view, that it may find a unified burden of proof is required by the ICWA.

¶ 5 First, a unified burden of proof is consistent with existing law and decisions of the Oklahoma Supreme Court regarding how the burden of proof is applied in other cases involving multiple elements of a claim or cause of action. *See e.g., Morris v. Leverett,* 1967 OK 164, ¶ 0, 434 P.2d 912 (Syllabus 3) (clear, decisive and unequivocal evidence required to establish elements necessary for a constructive trust); *Messinger v. Messinger,* 1958 OK 296, 341 P.2d 601 (one seeking to recover under a lost deed has the burden of proving the execution, delivery, and material contents of the deed by clear and convincing evidence); *Clark v. Lockstone,* 1934 OK 591, 170 Okla. 316, 39 P.2d 971 (elements of fraud must be proved by clear and convincing evidence); 43A O.S. Supp.2006 § 5–512 (requiring the findings necessary for involuntary commitment of a minor to be proven by clear and convincing evidence). Further, the appellate courts apply one burden of proof to each element of a claim in a decision under review. *Regal v. Riegel,* 1969 OK 145, ¶ 11, 463 P.2d 680, 683 (where a fact is required to be established by proof of a certain degree or character, the appellate court will determine whether or not the proof conforms to the required standard); *In re S.B.C.,* 2002 OK 83, 64 P.3d 1080 (appellate review of non-ICWA cases must determine the existence of clear-and-convincing evidence to terminate parental rights). In the criminal context, a bifurcated burden of proof would be similar to requiring the state to prove beyond a reasonable doubt that the defendant was in possession of a substance, but only requiring proof by a preponderance of the evidence that the substance was controlled.

¶ 6 Second, the bifurcated burden of proof would impose essentially the same procedural standard for ICWA parental rights termination cases that is currently employed in Oklahoma for non-Indian parental rights termination cases. *See In re C.G.,* 1981 OK 131, 637 P.2d 66 (requiring the State seeking to terminate parental rights pursuant to what is now 10A O.S. Supp.2010 § 1–4–904 to do so by clear and convincing evidence). *See also, Matter of T.R.W.,* 1985 OK 99, 722 P.2d 1197. Section 1–4–904 requires proof of three elements: (1) the child is deprived, (2) termination is in the child's best interest, and (3) one of the legal grounds listed in paragraph B is shown. I recognize that the bifurcated burden of proof would treat Oklahoma Indian and non-Indian parents alike except in two respects: the proof required to satisfy section 1912(f) and the distinction between state law "reasonable efforts" and section 1911(d) "active efforts." In my view, this similarity in treatment cannot be supported. In adopting a heightened burden of proof for parental rights termination cases, the *C.G.* Court recognized: "The law's policy must [guard] against a mistaken parental-bond severance...." *Id.* ¶ 17, 637 P.2d at 70. In the ICWA, Congress recognized that the parental bond among Indian families was more in jeopardy of inadequate protection than in non-Indian families and sought to establish federal standards governing the termination of that parental bond.

> The Congress hereby declares that it is the policy of this Nation to protect the best interests of Indian children and to promote the stability and security of Indian tribes

and families by the establishment of minimum Federal standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes which will reflect the unique values of Indian culture, and by providing for assistance to Indian tribes in the operation of child and family service programs.

25 U.S.C. § 1902. Nonetheless, whatever argument can be made for treating Indian and non-Indian termination proceedings alike in all but two respects must account for the fact that "active efforts" is a "minimal Federal standard," not a state law requirement.

¶ 7 Third, in addition to the potential lack of uniformity among states, the complexities of a bifurcated burden of proof are highlighted by the Alaska approach discussed by Mr. Hager at § 1–113. *See Neal M. v. State of Alaska,* 214 P.3d 284 (Alaska 2009); *Jon S. v. State of Alaska,* 212 P.3d 756 (Alaska 2009) (applying the clear-and-convincing burden to the state law grounds for termination and the ICWA "active efforts" requirements, beyond-a-reasonable-doubt to the ICWA § 1912(f) "serious damage" requirement, and the preponderance-of-the-evidence burden to the "best-interest-of-the-child" requirement). Assuming, as the *R.L.A.* Court did, that juries would not be confused in their deliberations as to when to apply what burden of proof, a broader issue remains: Is the bifurcated approach consistent with the purpose and intent of the ICWA? "It shall be the policy of the state to cooperate fully with Indian tribes in Oklahoma in order to ensure that the intent and provisions of the federal Indian Child Welfare Act are enforced." 10 O.S.2001 § 40.1.

¶ 8 Finally, the Oklahoma Supreme Court recently expressed its view of the purpose of the ICWA finding the Act must be considered "as a whole." *In re M.S.,* 2010 OK 46, ¶ 14, 237 P.3d 161, 165. Although parental rights termination was not at issue in that case, the Court found "a similarity in the potential for harm to the relationship between an Indian child and the child's tribe if the standard of proof required for 'good cause' not to transfer is inadequate." *Id.* ¶ 19, 237 P.3d at 167. By adopting a heightened burden of proof, *i.e.,* clear and convincing evidence rather than a preponderance of the evidence for a motion to transfer an ICWA case from state to tribal court filed pursuant to 25 U.S.C. § 1911(b), the Supreme Court, in my view, signaled the result I would reach with respect to the applicable burden of proof in ICWA termination cases. Further, as I read *M.S.,* the Supreme Court rejected, or at least found of limited usefulness, statutory interpretation of the ICWA like that used by this Court in *R.L.A.,* and typical of the jurisdictions adopting a bifurcated burden of proof.[3] "[T]he rule of '*expressio unius est exclusio alterius,*' *i.e.,* the mention of one thing in a statute implies exclusion of something else ... should be applied only as an aid in arriving at intention and should never be followed when doing so would override the intended purpose of the act." *M.S.,* 2010 OK 46, ¶ 12, 237 P.3d at 165. Instead, the Supreme Court has adopted a construction of the ICWA designed to achieve clearly expressed Congressional policy, even where that construction results in the curtailment of state authority. *See Id.* ¶ 14, 237 P.3d at 166 (citing *Mississippi Band of Choctaw Indians v. Holyfield,* 490 U.S. 30, 45, 109 S.Ct. 1597, 1607, 104 L.Ed.2d 29 (1989)).

¶ 9 Therefore, I respectfully dissent from that portion of the Majority Opinion adopting the clear-and-convincing burden of proof for the "active efforts" requirement and would adopt the beyond-a-reasonable-doubt standard for all elements required to be proven by the State in Father's termination case.

---

**3.** "Most courts that have considered the issue have concluded from the absence of a Congressional mandate that each state may choose an appropriate burden of proof by which to evaluate reunification efforts and have opted for a clear and convincing evidence standard." *Yvonne L. v. Arizona Dep't of Econ. Sec.,* 227 Ariz. 415, 258 P.3d 233 (Ariz.Ct.App.Div.1 2011).