IN THE MATTER OF V.D.



 

 
 
 
 
 
 Skip to Main Content
 Accessibility Statement
 
 
 
 
 
 Help
 Contact Us
 
 
 
 
 e-payments
 Careers
 
 
 
 
 
 
 
 
 
 
 
 Home
 Courts
 Decisions
 Programs
 News
 Legal Research
 Court Records
 Quick Links
 
 
 
 
 
 OSCN Found Document:IN THE MATTER OF V.D.

 

 
 



 
 
 
 
 Previous Case

 
 Top Of Index

 
 This Point in Index

 
 Citationize

 
 Next Case

 
 Print Only
 
 
 

 
 IN THE MATTER OF V.D.
2018 OK CIV APP 72
Case Number: 116959
Decided: 11/16/2018
Mandate Issued: 12/12/2018
DIVISION III
THE COURT OF CIVIL APPEALS OF THE STATE OF OKLAHOMA, DIVISION III
Cite as: 2018 OK CIV APP 72, __ P.3d __

 

IN THE MATTER OF V.D., B.J., E.B., A.B., S.R.D., and G.R.D., ALLEGED DEPRIVED CHILDREN:

STATE OF OKLAHOMA, Petitioner/Appellee,
v.
PATRICIA BLACK, Respondent/Appellant.

APPEAL FROM THE DISTRICT COURT OF
PITTSBURG COUNTY, OKLAHOMA

HONORABLE MINDY BEARE, JUDGE

AFFIRMED

Madison N. Holder, PITTSBURG COUNTY DISTRICT ATTORNEY'S OFFICE, McAlester, Oklahoma, for Petitioner/Appellee,

John Constantikes, McAlester, Oklahoma, for Respondent/Appellant.

Bay Mitchell, Judge:

¶1 Respondent/Appellant Patricia Black (Mother) appeals from an order terminating her parental rights to her children, V.D., B.J., E.B., A.B., S.R.D., and G.R.D. after a jury trial. On appeal, Mother challenges the adequacy of the services offered by the Department of Human Services to aid her in correcting the conditions that led to the children's being adjudicated deprived. Specifically, Mother contends she was not given adequate trauma-informed care to address her history of severe trauma. Mother also argues the State failed to prove beyond a reasonable doubt through the testimony of an expert that continued custody by Mother would result in serious emotional or physical damage to the children. We find the State showed clearly and convincingly that the services offered to Mother were adequate; we further find the State met its burden of proof regarding the threat of potential damage to the children. We affirm.

¶2 Mother has six children, ranging in age from one to twelve. The children's fathers' rights have all been previously terminated or were pending termination at the time of Mother's trial; none of the fathers are a part of this appeal. Following a suicide attempt while Mother was pregnant with her fifth child, the four older children were adjudicated deprived on November 19, 2015 due to lack of proper care, exposure to domestic violence, substance abuse/addiction, threat of harm, and lack of appropriate housing, among other things. A treatment plan was ordered for Mother on December 17, 2015. The fifth child, S.R.D., was born on December 23, 2015 and remained in Mother's custody. The sixth child, G.R.D., was born in February 2017 and also remained in Mother's custody.

¶3 One month after G.R.D.'s birth, B.J. and E.B. were placed with Mother in an extended thirty-day visit in anticipation of a second trial reunification, which was recommended to start in April 2017.[1] However, when DHS workers visited the home during the extended visit, they found several unknown people in the home with Mother and the children. One of the men had a criminal history, including sex-related charges involving a sixteen-year-old. The DHS workers found another man, who also had a lengthy criminal history, hiding in Mother's closet. Mother claimed she did not know he was there. DHS was concerned Mother was either unaware or unconcerned that people with criminal histories were in her home and around her children. DHS also suspected that Mother had relapsed on drugs. Although Mother passed a urinalysis drug screening, DHS ended the visit and sought a deprived petition for the two younger children. Two days later, the court ordered another drug test. Mother stated that she would not be able to pass it because she had done methamphetamine after the children were removed.

¶4 The two younger girls were adjudicated deprived and two additional ISPs were ordered for Mother. Mother made little progress on her treatment plans, and the State filed petitions to terminate Mother's rights to all the children on December 21, 2017. The cases were combined for trial. The jury unanimously found that Mother's parental rights should be terminated.

¶5 Where Indian children are involved, the proceedings must comply with the provisions of both the federal Indian Child Welfare Act, 25 U.S.C. §1901, et seq. and its Oklahoma counterpart, the Oklahoma Indian Child Welfare Act, 10 O.S. §40, et seq. B.J., E.B., and A.B. are not Indian children and, therefore, are not subject to either act. V.D., S.R.D, and G.R.D., however, are Indian children subject to the acts. Before parental rights can be terminated in cases involving Indian children, ICWA requires the State to show "active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful." 25 U.S.C. §1912(d). In cases not involving Indian children, "reasonable efforts" must be exercised by DHS to return children to their home. In re E.P.F.L., Jr., 2011 OK CIV APP 112, ¶25, 265 P.3d 764, 769; see also 10A O.S. Supp. 2015 §1-4-807(D)(1)(g) (requiring the court to determine at each periodic review hearing "whether reasonable efforts have been made to provide for the safe return of the child to the child's own home.").

¶6 Mother's first claim on appeal is that the State failed to show, by clear and convincing evidence, that she was provided adequate services to help her correct the conditions which caused the children to be adjudicated deprived. Specifically, Mother contends DHS failed to provide her with trauma-informed care to address Mother's history of severe trauma, which, Mother argues, is the basis for her substance abuse, depression, and other issues. Although not stated in these exact words, Mother essentially argues the State failed to prove DHS provided active or reasonable efforts to reunite her with her children.[2] What comprises "active" or "reasonable" efforts must be decided on a case-by-case basis. See In re E.P.F.L, Jr., 2011 OK CIV APP 112, ¶25, 265 P.3d at 769. We review the record to determine whether the State provided clear and convincing evidence that adequate efforts were expended. See In re J.S., 2008 OK CIV APP 15, ¶4, 177 P.3d 590, 591 (holding that ICWA's beyond a reasonable doubt standard of proof applies only to the factual determination required in ICWA termination cases "that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child," whereas the lesser standard of "clear and convincing" evidence is applicable to all other state law requirements for termination.).

¶7 In her Brief-in-Chief, Mother reviews her long history of trauma and notes that her original treatment plan specified that she was to "focus on her underlying issues such as her past trauma, as well as her children's." Mother contends DHS did not do enough to help her address her traumatic past. Mother faults DHS for not connecting Mother with a counselor who specialized in trauma and for waiting until September 2017 to have a psychological evaluation of Mother.

¶8 The record shows, however, that DHS made significant steps to help Mother with her mental health issues. Mother was seeing her own licensed professional counselor, Brenda Polansky, with whom Mother had a previous relationship from working with her children. When asked whether she ever tried to find a different mental health provider who would be more tailored to her needs, Mother stated, "[N]o, because . . . I felt like Brenda was pretty specific to what I needed[.]" The DHS permanency planning caseworker, Christie Young, stated she had concerns about Mother's therapist meeting Mother's needs and had spoken to Mother about it but Mother repeatedly refused to change providers. Ms. Young testified that she contacted a mental health consultant regarding Mother's therapeutic needs and how to work with Mother's current therapist; she stated she sent questions to Mother's counselor regarding Mother's treatment but never got a response. Ms. Young also made an appointment for Mother at Caring Hands for a mental health assessment and treatment. However, when Ms. Young arrived to give Mother a ride to the appointment, Mother would not come to the door, and Ms. Young was unable to get Mother to reschedule the appointment. Mother also admitted to missing an initial mental health appointment at Carl Albert, stating that she could not get out of bed that day.

¶9 Ms. Young also testified about the other services and gestures offered to Mother. Ms. Young testified that, when Mother relapsed after the children were removed from the thirty-day visit, she transported Mother to a rehabilitation facility in Lawton. Mother only stayed for several days before she called Ms. Young saying she needed to leave because she needed to detox before she could engage in the program. Ms. Young stated that she asked the facility in Lawton to help get Mother into a detox facility before Mother left, and, when they could not help, she asked for a list of places to call. She said she and Mother called multiple detox facilities but were unable to find an opening. Ms. Young stated that she offered to take Mother to the hospital to detox, but Mother declined and asked Ms. Young to take her to a friend's house. Ms. Young also testified about the extensive lengths she took to encourage Mother to get a job, including filling out employment applications for Mother and offering to drive Mother around to submit applications. Ms. Young further noted that she had taken Mother to a church to get food when she had nothing to eat; that she had given Mother a rocking chair, a coffee table, and kitchen utensils from her own home; and that she had taken up a furniture collection from her coworkers for Mother.

¶10 In sum, the record shows that DHS supported Mother in her journey to correct the conditions that led to the children's being adjudicated deprived. Although Mother contends there are various instances in which DHS could have done more, we find DHS' attempts to help Mother in her efforts to reunite with the children were more than adequate. Accordingly, we find the State met its burden to show, by clear and convincing evidence, that both reasonable and active efforts were offered in this case.

¶11 In cases involving Indian children, ICWA also requires the State to prove, beyond a reasonable doubt, "that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child." 25 U.S.C. §1912(f). The State's evidence must include "testimony of qualified expert witnesses." Id. Mother's second and final proposition of error is that the State's expert witness testimony was not sufficient, citing In re IW, MM, Jr., and NK, 2018 OK CIV APP 6, 419 P.3d 362. There, another division of this Court found there was "a total lack of expert witness testimony to support a conclusion beyond a reasonable doubt that continued custody of the minor children by Father is likely to result in serious emotional or physical damage" because the expert never affirmatively testified the children would suffer harm if returned and stated he was "just really unsure" on the matter. Id., ¶¶14 & 17, 419 P.3d at 365-66.

¶12 Here, we do not find a "total lack of expert witness testimony." Cindy Taylor for the Choctaw Nation and Amanda Neugin for the Cherokee Nation testified as expert witnesses.[3] Ms. Taylor stated that S.R.D. and G.R.D. are young and vulnerable, and she was unsure how Mother would be able to care for them when Mother had admitted at trial she was currently unable to care for herself. She stated she was concerned that Mother was homeless and had nowhere to take the children. Ms. Neugin testified that, because Mother continued to use illegal substances, her mental health issues had not been corrected, and she did not have stable housing, V.D.'s safety would be at risk if returned to Mother's care. Both experts stated specific reasons why they felt continued custody would result in serious emotional or physical harm. Further, other witnesses testified about the same concerns: "ICWA does not require that the experts' testimony provide the sole basis for the court's conclusion that continued custody will likely result in serious emotional or physical damage; ICWA simply requires that the testimony support that conclusion." Id., ¶16, 419 P.3d at 366 (citation omitted). We find that the experts' testimony here supported the jury's conclusion that, beyond a reasonable doubt, continued custody by Mother would likely result in serious emotional or physical damage to the children.

¶13 AFFIRMED.

SWINTON, P.J., and GOREE, V.C.J., concur.

FOOTNOTES

[1] Mother had a brief trial reunification with V.D. and B.J. in February and March 2016.

[2] In support of her argument, Mother cites 10A O.S. Supp. 2014 §1-4-902(B)(3). Section 1-4-902(A) delineates the circumstances in which the district attorney must file a petition to terminate parental rights; subsection (B)(3) provides an exception to subsection (A), providing that the district attorney is not required to file a petition to terminate if "[t]he state has not provided to the family of the child, consistent with the time period in the state case plan, services that the state deems necessary for the safe return of the child to the child's home, if reasonable efforts are required to be made with respect to the child." Id. Although §1-4-902(B)(3) refers to services, it is not the source from which DHS' duty to provide services derives and thus is not on point.

[3] S.R.D. and G.R.D. are Choctaw tribal members or eligible for Choctaw membership. V.D. is a Cherokee tribal member or eligible for Cherokee membership.






 Citationizer© Summary of Documents Citing This Document
 
 
 
 Cite
 Name
 Level
 
 
 
 None Found.
 
 
 Citationizer: Table of Authority
 
 
 
 Cite
 Name
 Level
 
 
 
 Oklahoma Court of Civil Appeals Cases
 Cite
Name
Level

 2008 OK CIV APP 15, 177 P.3d 590, IN THE MATTER OF J.S.
Discussed
 2011 OK CIV APP 112, 265 P.3d 764, IN THE MATTER OF E.P.F.L.
Discussed at Length
 2018 OK CIV APP 6, 419 P.3d 362, IN THE MATTER OF IW
Discussed
Title 10. Children
 Cite
Name
Level

 10 O.S. 40, Short Title
Cited


 
 








 
 
 
 

 
 

 
 
 
 oscn
 
 EMAIL: webmaster@oscn.net
 Oklahoma Judicial Center
 2100 N Lincoln Blvd.
 Oklahoma City, OK 73105
 
 
 courts
 
 Supreme Court of Oklahoma
 Court of Criminal Appeals 
 Court of Civil Appeals
 District Courts
 
 
 
 decisions
 
 New Decisions
 Supreme Court of Oklahoma
 Court of Criminal Appeals
 Court of Civil Appeals
 
 
 
 programs
 
 The Sovereignty Symposium
 
 Alternative Dispute Resolution
 Early Settlement Mediation
 Children's Court Improvement Program (CIP)
 Judicial Nominating Commission
 Certified Courtroom Interpreters
 Certified Shorthand Reporters
 Accessibility ADA
 
 
 
 
 
 
 
 
 Contact Us
 Careers
 Accessibility ADA