OSCN Found Document:IN THE MATTER OF MINOR CHILD G.V.

 
 
 

 
 
 
 
 
 
 
 

 


 
 
 
 
 
 


 
 OSCN navigation


 
 
 Home

 
 Courts

 
 
 Court Dockets
 

 
 Legal Research

 
 Calendar

 
 Help
 
 





 
 
 
 Previous Case

 
 Top Of Index

 
 This Point in Index

 
 Citationize

 
 Next Case

 
 Print Only
 
 
 
 
 

 
 
 
 IN THE MATTER OF MINOR CHILD G.V.
2016 OK CIV APP 6
Case Number: 113934
Decided: 12/16/2015
Mandate Issued: 01/27/2016
DIVISION IV
THE COURT OF CIVIL APPEALS OF THE STATE OF OKLAHOMA, DIVISION IV
Cite as: 2016 OK CIV APP 6, __ P.3d __

 

IN THE MATTER OF MINOR CHILD: G.V., Alleged to be deprived.

ABRAHAM SIMMERS, Appellant,
v.
STATE OF OKLAHOMA, Appellee.

APPEAL FROM THE DISTRICT COURT OF
CREEK COUNTY, OKLAHOMA

HONORABLE MARK A. IHRIG, TRIAL JUDGE

AFFIRMED

J. Travis Barnett, HOOD AND BARNETT, P.L.L.C., Tulsa, Oklahoma, for Appellant
Max Cook, DISTRICT ATTORNEY OF CREEK COUNTY, Kelly Allen, ASSISTANT DISTRICT ATTORNEY, Sapulpa, Oklahoma, for Appellee

DEBORAH B. BARNES, JUDGE:

¶1 Appellant Abraham Simmers (Father), a citizen of the Muscogee (Creek) Nation (MCN), appeals from an Order of the trial court overruling his motion for new trial in which he asked the trial court to vacate its order finding active efforts had been made to provide remedial services and rehabilitative programs designed to prevent the breakup of an Indian family and that those efforts proved to be unsuccessful as mandated by the Federal Indian Child Welfare Act (ICWA), 25 U.S.C. §§ 1901-1963 (2014). We affirm.

BACKGROUND[1]

¶2 In September 2012, Appellee State of Oklahoma (State) filed its petition seeking to have G.V. and his two older brothers adjudged deprived. G.V., at age one month, had been left alone at home by his mother (Mother) and taken into custody. G.V.'s blood tested positive for amphetamines and methamphetamines at the time of his birth. At the time of the petition, Mother's husband (Husband) was listed as G.V.'s father on the child's birth certificate. The petition alleged the conditions Mother and Husband needed to correct are: "Failure to Provide a Safe and Stable Home, Threat of Harm, Substance Abuse, and Domestic Violence." All three children are Indian children belonging to the MCN. The children were adjudicated deprived on November 5, 2012.

 

¶3 However, it was not until May 8, 2014, that the Department of Human Services (DHS) learned Father was G.V.'s biological father. Husband had indicated he did not believe he was G.V.'s biological father. After numerous delays by Husband to undergo DNA testing, he was tested and determined not to be G.V.'s father. Father was then identified as the possible father; DNA testing proved he is G.V.'s biological father.

¶4 Upon learning of Father's status, DHS developed an Individual Service Plan (ISP). On May 12, 2014, a DHS caseworker met with Father in the Creek County jail and completed a family functional assessment. Father's ISP was developed based on his criminal history and the assessment the DHS caseworker completed with Father. The conditions Father needed to correct were to provide G.V. with "a safe and stable home that is free from substance abuse and exposure to domestic violence."[2] The ISP contained several "To Do's" for Father including completion of DHS-approved parenting and anger management classes and completion of a substance abuse assessment, and, upon his release from prison, he was to submit to random urinalysis and/or hair strand analysis, provide a safe and stable home for G.V., and obtain a legal means of income to care for G.V. In July 2014, the court adopted the ISP noting it was reviewed in open court with Father and Father stipulated to it.

¶5 The July 30, 2014 ISP progress report states Father was then in the Tulsa County jail and in the custody of the Department of Corrections (DOC). It also stated the DHS case worker attempted to contact Father's DOC case manager but had received no return call. It also noted G.V. had been having every-other-week visitation with his paternal grandmother and aunt. The report noted the DHS caseworker's inability to verify any progress by Father in participating in parenting and anger management classes or substance abuse assessment "due to [Father's] being moved to Tulsa County Jail and [her inability] to contact [Father's] case manager."

¶6 The November 24, 2014 ISP progress report again states efforts to contact Father's DOC case manager had been unsuccessful and that Father was now in the Davis Correctional Facility in Holdenville. It notes the visits between G.V. and his paternal grandmother and aunt are "going very well." As to Father, the report states DHS had been unable to verify that Father enrolled in or completed the aforementioned classes and assessments. The DHS active efforts report noted the DHS caseworker's efforts to call the DOC case manager on October 7 and 30, 2014, and again on November 20, 2014. It also listed the numerous visitations between G.V. and "his paternal extended family."

¶7 An addendum to the court report was filed December 2, 2014, in which the DHS caseworker reported she had been contacted by Father's DOC case manager. DHS was informed that as a condition of his parole, Father was ordered to complete Thinking for a Change and his GED. She was also informed Father had been placed in segregation until the end of December 2014 because he was found to be in possession of a knife, and he would be transferred to "phase unit" for nine months after segregation. The DOC case manager informed DHS that Father had not initiated any of the aforementioned classes and assessments prior to being transferred to segregation, but that he would be offered Thinking for a Change and GED while in segregation. The report also notes the DHS caseworker's inquiry about how she could schedule visitation with Father.

¶8 On January 27, 2015, State made a motion to terminate Father's parental rights upon the grounds that, pursuant to: 10A O.S 2011 § 1-4-904(B)(5), Father had been permitted a period of not less than three months to correct the conditions, which included Father's failure to comply with the court-ordered standards at the May 28, 2014 dispositional hearing; 10A O.S. 2011 § 1-4-904(B)(12), Father has been incarcerated and G.V. has been placed outside the home of the parent, guardian or extended family member and continuation of his parental rights would cause harm to G.V.; and 10A O.S. 2011 § 1-4-904(B)(15), G.V. has been in foster care for fifteen of the last twenty-two months. State alleged it is in G.V.'s best interests to terminate Father's parental rights.

¶9 An active efforts hearing was held on February 13, 2015, at the conclusion of which the trial court found State presented clear and convincing evidence that active efforts had been made and that those efforts were unsuccessful. A jury trial on the termination of Father's parental rights was held February 25 and 26, 2015. The jury returned a verdict terminating Father's parental rights.

¶10 On March 11, 2015, the trial court entered its Order adopting, among other things, the findings of the jury that termination of Father's parental rights is in G.V.'s best interests and that Father's parental rights should be terminated pursuant to § 1-4-904(B)(12) & (15). The court further found that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that those efforts have proved unsuccessful.

¶11 On March 18, 2015, Father filed his motion for new trial in which he asked the court to vacate its March 2015 Order because the DHS worker's failure to meet DHS policy - that contact be made once a month with Father or his caseworker - was a failure to meet the minimum policy of DHS and, consequently, "does not meet the meaning of active efforts." The court overruled Father's motion and Father appeals.

STANDARD OF REVIEW

¶12 Where Indian children are involved, the proceedings must comply with the provisions of both ICWA and its Oklahoma counterpart, the Oklahoma Indian Child Welfare Act, 10 O.S. 2011 §§ 40-40.9 (OICWA): "The [OICWA], in accordance with [ICWA], applies to all child custody proceedings involving any Indian child . . . ." 10 O.S. 2011 § 40.3A. Father challenges the sufficiency of the evidence offered to prove State's active efforts to provide remedial services and rehabilitative programs to Father that were designed to prevent the breakup of the Indian family.

¶13 As stated by another Division of this Court,

[The] "active efforts" requirement [of 25 U.S.C. § 1912(d)], for which the State has the burden of proof, is a predicate finding of the trial court made before a termination case may proceed. The meaning of "active efforts," . . . [is a] legal ruling[]. As with any other legal rulings which are reviewed de novo, this review requires an independent, non-deferential re-examination of those rulings. See In re A.M. & R.W., 2000 OK 82, 13 P.3d 484.

In re J.S., 2008 OK CIV APP 15, ¶ 5, 177 P.3d 590 (emphasis in original). See also In re E.P.F.L., Jr., 2011 OK CIV APP 112, ¶ 25, 265 P.3d 764. However, there is not a definition of what comprises "active efforts" and the issue must therefore be determined case by case. E.P.F.L., ¶ 25. Active efforts must be proven by clear and convincing evidence. See, e.g., In re Adoption of G.D.J., 2011 OK 77, ¶ 37 n.25, 261 P.3d 1159.

¶14 With respect to a trial court's refusal to grant Father's motion for new trial, the standard of review on appeal is abuse of discretion. Taliaferro v. Shahsavari, 2006 OK 96, ¶¶ 14-15, 154 P.3d 1240. This Court will not reverse a trial court under this standard unless the trial court "reached a conclusion that is clearly against the evidence and reason." Conoco Inc. v. Agrico Chem. Co., 2004 OK 83, ¶ 14, 115 P.3d 829 (citation omitted). An abuse of judicial discretion occurs "when discretion is exercised to an end or purpose not justified by, and clearly against, reason and evidence." Patel v. OMH Med. Ctr., Inc., 1999 OK 33, ¶ 20, 987 P.2d 1185 (footnote omitted).

ANALYSIS

¶15 Father offers three propositions on appeal, but they all make the same essential argument: the trial court erred in finding State proved by clear and convincing evidence active efforts had been made as required by 25 U.S.C. § 1912(d) and the court thus abused its discretion in overruling his motion for new trial.

I. Applicability of 25 U.S.C. § 1912(d)

¶16 With the exception of setting forth the requirements of 25 U.S.C. § 1912(e), Father has offered no authority for any of the propositions he raises on appeal.[3] Section 1912(e) provides as follows:

Foster care placement orders; evidence; determination of damage to child

No foster care placement may be ordered in [any involuntary proceeding in a state court involving an Indian child] in the absence of a determination, supported by clear and convincing evidence, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child.[4]

 

¶17 Father also quotes from the mandate set forth in §1912(d), which provides:

Remedial services and rehabilitative programs; preventive measures

Any party seeking to effect a foster care placement of, or termination of parental rights to, an Indian child under State law shall satisfy the court that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful.[5]

Father's arguments on appeal rest on what he claims is State's failure to meet the active efforts requirement of § 1912(d), though he discusses no case authority for his assertions that the efforts made here were insufficient to meet the demands of § 1912(d).

 

¶18 Significantly, Father has not replied to State's first proposition in its appellate brief that § 1912(d) does not apply in this case because G.V. was never in Father's legal or physical custody, citing Adoptive Couple v. Baby Girl, 133 S. Ct. 2552 (2013). In Baby Girl, the five-member majority of the U.S. Supreme Court disagreed with the South Carolina Supreme Court's determination that the parental rights of the biological father, a citizen of the Cherokee Nation, could not be terminated where he had not been provided remedial services pursuant to § 1912(d). 133 S. Ct. at 2562. The U.S. Supreme Court stated:

Consistent with the statutory text, we hold that § 1912(d) applies only in cases where an Indian family's "breakup" would be precipitated by the termination of the parent's rights. The term "breakup" refers in this context to "[t]he discontinuance of a relationship," American Heritage Dictionary 235 (3d ed. 1992), or "an ending as an effective entity," Webster's 273 (defining "breakup" as "a disruption or dissolution into component parts: an ending as an effective entity"). See also Compact OED 1076 (defining "break-up" as, inter alia, a "disruption, separation into parts, disintegration"). But when an Indian parent abandons an Indian child prior to birth and that child has never been in the Indian parent's legal or physical custody, there is no "relationship" that would be "discontinu[ed]" - and no "effective entity" that would be "end[ed]" - by the termination of the Indian parent's rights. In such a situation, the "breakup of the Indian family" has long since occurred, and § 1912(d) is inapplicable.

133 S. Ct. at 2562.

¶19 In the present case, Father does not dispute that he has never had physical or legal custody of G.V. Indeed, he has never met G.V. However, while he has been incarcerated throughout G.V.'s lifetime, State has not argued that Father abandoned G.V. Husband, not Father, was listed as G.V.'s father on his birth certificate and DNA testing to determine paternity was delayed through no fault of Father. The facts in the present case are, therefore, distinguishable from those in Baby Girl; however, the U.S. Supreme Court's reasoning applies to the circumstances presented here. Here, as in Baby Girl, "there is no 'relationship' that would be 'discontinu[ed]' - and no 'effective entity' that would be 'end[ed]' - by the termination of the Indian parent's rights." Id. Under these circumstances, "the 'breakup of the Indian family' has long since occurred, and § 1912(d) is inapplicable." Id.

¶20 We further find support for this conclusion in the Oklahoma Supreme Court's holding and reasoning in In re Baby Boy L, 2004 OK 93, 103 P.3d 1099. Although Baby Boy L was decided before Baby Girl, in Baby Boy L the Oklahoma Supreme Court discussed at length both ICWA and OICWA and the continued viability of a judicially developed exception to those Acts in child custody proceedings known as the "existing Indian family exception." Through that exception, Oklahoma courts followed other state courts in finding that "[e]ven where the threshold requirements of the federal Act have been met," the statutory scheme would not be followed in circumstances where, among others, "the Indian child proceeding does not involve . . . the removal of custody from an Indian parent." Baby Boy L, ¶ 1 (footnote omitted).

¶21 Relying heavily on the U.S. Supreme Court's reasoning in Mississippi Band of Choctaw Indians v. Holyfield, 490 U.S. 30 (1989) - a precedent also discussed by the Baby Girl Court[6] - and the Oklahoma Legislature's response to the holding in Holyfield, the Oklahoma Supreme Court held "the 'existing Indian family exception' is no longer pertinent to Indian child custody proceedings in Oklahoma . . . ." Baby Boy L, ¶ 2. The Supreme Court referenced §§ 40.1 and 40.3(B)[7] in holding that OICWA controls regardless of whether the child involved in the custody proceeding is in "the physical or legal custody of an Indian parent . . . when the state proceedings are initiated." Baby Boy L, ¶ 18.

¶22 The Supreme Court extensively discussed the Legislature's expressed intent in enacting the 1994 amendments to OICWA. The Court explained:

When ascertaining legislative intent, the Court must presume that when adopting an amendment, the Legislature had knowledge of the law as it previously existed and had in mind the judicial construction placed on the law. Under the current statutory scheme, the Oklahoma Act controls regardless of whether the child or children involved in the proceeding are in the physical or legal custody of an Indian parent or Indian custodian when the state proceedings are initiated. The change in the statute is an explicit repudiation of the "existing Indian family exception."

Baby Boy L, ¶ 18 (footnotes omitted) (emphasis added).[8]

¶23 While it may appear that the holdings in Baby Boy L and Baby Girl are at odds with one another, we conclude they are not. Factually, the cases differ. Unlike the circumstances in Baby Girl, in Baby Boy L, mother lived with father and the fraternal grandmother for two months while mother was pregnant. 2004 OK 93, ¶ 4. Father, a teenager, quit school and was employed full time. After an argument between mother and father, mother moved out and, according to father, told father she had miscarried. Thereafter, mother decided to place the baby for adoption and was advised to notify father immediately that she was still pregnant. Upon advising father that she was pregnant and intended to place the baby for adoption, father protested the adoption. Conversely, Baby Girl involved a father who relinquished his rights while the mother was pregnant and the complete absence of any relationship between the parent and child at any time.

¶24 Moreover, the Court in Baby Boy L was concerned not just with the exception's effect on the rights of parents, but also on the interests of the Indian tribe or nation. While the decision in Baby Girl may now inform the states about the circumstances in which § 1912(d) is inapplicable, the Oklahoma Supreme Court's reasoning in Baby Boy L - that the governmental interests of an Indian tribe or nation may not be thwarted merely by the parent's lack of physical or legal custody of the child at the time state proceedings were initiated - is preserved in Baby Girl.[9]

¶25 Given the absence of any relationship between Father and G.V. and the non-existence of an Indian family, we conclude the active efforts provision of § 1912(d) does not apply in this case pursuant to Baby Girl and Father, thus, has presented no valid argument on appeal for reversal of the trial court's Order denying him a new trial.[10]

 

II. Active Efforts

 

¶26 We further conclude, however, that even if § 1912(d) were applicable,[11] here the trial court correctly made the required predicate finding of active efforts before allowing Father's case to proceed to the jury because State met its burden by clear and convincing evidence that active efforts were made.

¶27 Father argues State's evidence of active efforts at the active efforts hearing and during testimony in the termination of parental rights trial amounts to nothing more than conversations with and words of encouragement to Father. He maintains the DHS worker's failure to abide by DHS polices to contact him or his case manager monthly and to send copies of all reports filed in the case to Father or his case manager proves DHS has not even met its minimal requirements applicable to any parent and, therefore, not the proactive efforts required by § 1912(d). Consequently, Father argues the trial court abused its discretion in refusing to vacate the order terminating his parental rights and to grant him the opportunity for a new active efforts hearing.

¶28 In its Order overruling Father's motion for new trial, the trial court found "the active efforts requirement does not mean that every single thing that could have been done must have been done; rather, the question is whether efforts were more than passive." The trial court quoted from Pravat P. v. State of Alaska, 249 P.3d 264 (Alaska 2011), in which the Alaska Supreme Court stated "the active efforts requirement does not require perfection. Our concern is not with whether the State's efforts were ideal, but with whether they crossed the threshold between passive and active efforts." Id. at 272 (footnote omitted). In distinguishing between passive and active efforts, the Alaska Supreme Court explained:

Passive efforts are where a plan is drawn up and the client must develop his or her own resources towards bringing it to fruition. In contrast, [a]ctive efforts [are] where the state caseworker takes the client through the steps of the plan rather than requiring that the plan be performed on its own. For instance, rather than requiring that a client find a job, acquire new housing, and terminate a relationship with what is perceived to be a boyfriend who is a bad influence, [ICWA] would require that the caseworker help the client develop job and parenting skills necessary to retain custody of her child.

Id. at 271 (footnote omitted). Oklahoma appellate courts have drawn a similar distinction between active and passive efforts. See, e.g., In re J.S., 2008 OK CIV APP 15, ¶ 13 (citing A.A. v. State of Alaska, 982 P.2d 256 (Alaska 1999)).

¶29 The effect of a parent's incarceration on the scope of the active efforts the State can provide to satisfy § 1912(d) was discussed at length in In re E.P.F.L., 2011 OK CIV APP 112. In discussing A.A., this Court stated:

In [A.A.], the Supreme Court of Alaska was asked to determine whether the State of Alaska had met its burden of proof that active efforts had been made to provide remedial services for an Indian family where the father was incarcerated. The Court stated:

A parent's incarceration significantly affects the scope of the active efforts that the State must make to satisfy the statutory requirement. While "[n]either incarceration nor doubtful prospects for rehabilitation will relieve the State of its duty under ICWA to make active remedial efforts," the practical circumstances surrounding a parent's incarceration - the difficulty of providing resources to inmates generally, the unavailability of specific resources, and the length of incarceration - may have a direct bearing on what active remedial efforts are possible. Thus, while the State cannot ignore its ICWA duties merely because of [the father's] incarceration, his incarceration is a significant factor in our evaluation of the adequacy of the State's efforts in this case.

Id. ¶ 36.

¶30 We agree with the trial court's observation that DHS policies are in place for a good reason and DHS workers should comply with those policies, but failure to observe those policies does not end the inquiry into active efforts. The DHS caseworker's testimony at the active efforts hearing and at trial was that in non-ICWA cases, she does not often visit an incarcerated parent in jail or prison. During the nine months between the development of his ISP and the active efforts hearing, the DHS caseworker testified she had visited Father in jail three times - May 12, 2014, August 4, 2014, and January 22, 2015. She also attempted to contact Father's case manager while he was incarcerated on October 30, 2014, and November 20, 2014. She was contacted by the DOC case manager on November 25, 2014.

¶31 The DHS caseworker testified that when she visited Father she addressed what services he could undertake while incarcerated, though she said those services were limited. She further testified she had extensive conversations with Father about his ISP whenever she visited him in jail. She further testified that she discussed with Father's prison case manager the services available to Father while he was in prison and the possible time frame in which he might start those services.[12]

¶32 The DHS caseworker testified she also had regular contact with the MCN state reunification program manager. During both her active efforts and trial testimony, the MCN caseworker testified she was satisfied active efforts had been made in this case and no additional efforts could have been made by State or the MCN that would have changed the outcome. She testified the MCN is in agreement with the termination of Father's parental rights and the adoption of G.V., and in agreement that G.V. is in an ICWA-compliant home.

 

¶33 The MCN caseworker testified that she, too, visited Father in the Tulsa County and Creek County jails on four occasions, she contacted Father's prison case manager to determine what classes or training Father could take, she visited G.V., and met with Father's family. She testified at trial that she was at the first visit between G.V. and his paternal grandmother and paternal aunt and that they have visited regularly with G.V. since June 2014. She also testified there is no record that Father ever enrolled in any of the classes that were available to him in prison. She admitted she had not visited Father while in DOC custody although she planned a visit in December 2014 that she had to cancel.

¶34 As found by the trial court, Father was aware of what he was required to do and that services were available to him while he was incarcerated to meet his ISP obligations. In fact, Father testified that it was the DHS caseworker who brought to his attention parenting classes that were offered in the Tulsa County jail.[13] Father also testified he was required to work in the prison kitchen for four months before he was allowed to start those classes, and he began working in the kitchen in September 2014. Thus, according to Father, he could not begin classes until January 2015 and claimed he was unable to start a program at that time because he was moved to the Creek County jail. He agreed that "based on the transportation and time requirements for [him] to have a job," he was unable to start any classes. However, the DHS caseworker's testimony was uncontradicted that while Father was in segregation in December 2014 and then in phase unit, the prison made available to him services he never pursued. The trial court found "it seems additional contacts by the caseworker are unlikely to have been productive."

¶35 We agree with the trial court that State's efforts in this case, though not perfect, crossed the line between passive and active. While the scope of the efforts was limited by Father's incarceration in multiple locations, taken as a whole this is not a case where a plan was made and Father was left to his own devices to complete it. See, e.g., In re J.S., 2008 OK CIV APP 15, ¶ 16.

¶36 We conclude State presented clear and convincing evidence that DHS made active efforts to provide remedial services and rehabilitative programs designed to prevent the breakup of an Indian family and that those efforts were unsuccessful. Consequently, assuming the existence of an Indian family, the trial court did not abuse its discretion in overruling Father's motion for new trial.

CONCLUSION

¶37 Based on the facts in this case, we conclude § 1912(d) of ICWA is inapplicable because there was no relationship or Indian family entity to breakup; thus, State was not required to prove by clear and convincing evidence that active efforts were made pursuant to §1912(d). However, even assuming § 1912(d) does apply here, we conclude the trial court did not abuse its discretion in finding State presented clear and convincing evidence of active efforts and that those efforts proved to be unsuccessful. Further, the trial court did not abuse its discretion in overruling Father's motion for new trial. Accordingly, we affirm.

¶38 AFFIRMED.

RAPP, P.J., and THORNBRUGH, J., concur.

FOOTNOTES

[1] Although Father appears to make some reference to the sufficiency of the evidence supporting the jury's determination that his parental rights be terminated, see, e.g., n.3, infra, neither in his motion for new trial nor on appeal does he challenge the jury's verdict. Thus, we will not discuss at any length the evidence supporting that verdict, but instead will focus on the record facts concerning the issue of active efforts.

[2] The ISP noted G.V. was in a foster placement with his brothers, that they were bonded and "clearly love each other." Further, the ISP stated DHS would be scheduling a visit for Father's sister and mother with G.V. and that a Family Team meeting would be scheduled to discuss G.V.'s visitation and placement.

[3] We further note that in his Table of Authorities in his Brief-in-chief, Father lists 12 O.S. 2011 § 2602 (Lack of Personal Knowledge) and 12 O.S. 2011 § 2901 (Requirement of Authentication or Identification) of the Oklahoma Evidence Code. Though it is unclear, presumably the reference to § 2602 concerns Father's assertion that the expert opinion of the MCN caseworker that he posed a physical threat of harm to G.V. was not based on personal knowledge and is, therefore, an invalid basis. However, Father has not argued those statutory provisions in his appellate brief nor does he point to where during the jury trial or during the hearing on active efforts he made objections to testimony based on those provisions or how they are preserved for appeal and for what purpose they are referenced on appeal. Consequently, we do not consider them in this Opinion. See, e.g., Messler v. Simmons Gun Specialties, Inc., 1984 OK 35, ¶ 22 n.11, 687 P.2d 121 (Plausible, but unconvincing "argument in a brief which is unsupported by citations of authority is" insufficient "to overcome the presumption in favor of the correctness of the judgment of the trial court. Assignments of error which are not argued or supported in the brief with citations of authority will generally be treated as waived.") (citations omitted). Moreover, Father's motion for new trial only concerned the propriety of the trial court's ruling that active efforts had been made. The motion made no mention of the evidence supporting the jury's verdict terminating his parental rights on the ground that his incarceration represented a harm to G.V. and because G.V. had been in foster care for at least fifteen out of the most recent twenty-two months preceding the filing of the motion to terminate parental rights, nor did the motion seek a new trial based on the trial court's order terminating those rights.

[4] (Emphasis added.) G.V. was never in Father's custody and Father offers no explanation about why this provision applies to the present case. The trial court did make a specific finding at the active efforts hearings that sufficient evidence had been presented to demonstrate, beyond a reasonable doubt, that the continued custody of G.V. by Father is likely to result in serious emotional or physical damage to G.V. However, we note the crux of Father's arguments on appeal rest upon the requirements set forth in § 1912(d).

[5] OICWA does not have a state counterpart to § 1912(d), although 10 O.S. 2011 § 40.5 provides, in part, as follows:

A. When a court order authorizes the emergency removal of an Indian child from the parent or Indian custodian of such child in accordance with 25 U.S.C. § 1922, the order shall be accompanied by an affidavit containing the following information:
. . . ;
2. A specific and detailed account of the circumstances that lead the agency responsible for the removal of the child to take that action; and
3. A statement of the specific actions that have been taken to assist the parents or Indian custodians so that the child may safely be returned to their custody.

While § 40.5(3) requires a "statement of the specific actions that have been taken to assist the parent[]," that provision does not specifically require "active efforts" and it contemplates the child's "return[]" to the parent's "custody." The expressed legislative intent in enacting OICWA, however, is set forth in § 40.1, as follows:

The purpose of [OICWA] is the clarification of state policies and procedures regarding the implementation by the State of Oklahoma of [ICWA]. It shall be the policy of the state to recognize that Indian tribes and nations have a valid governmental interest in Indian children regardless of whether or not said children are in the physical or legal custody of an Indian parent or Indian custodian at the time state proceedings are initiated. It shall be the policy of the state to cooperate fully with Indian tribes in Oklahoma in order to ensure that the intent and provisions of [ICWA] are enforced.

Consequently, the active efforts requirement set forth in § 1912(d) - if applicable - is fully enforced in Oklahoma custody proceedings, including proceedings for the termination of parental rights.

[6] 133 S. Ct. at 2557.

[7] Section 40.3(B) provides:

Except as provided for in subsection A of this section, the Oklahoma Indian Child Welfare Act applies to all state voluntary and involuntary child custody court proceedings involving Indian children, regardless of whether or not the children involved are in the physical or legal custody of an Indian parent or Indian custodian at the time the state proceedings are initiated.

[8] The Supreme Court also specifically noted that the U.S. Supreme Court had yet to address the split among jurisdictions concerning the viability of the "existing Indian family exception" under ICWA. Id. ¶ 18 n.21.

[9] Although, according to the Baby Girl Court, as a factual matter adoption placement preferences pursuant to 25 U.S.C. § 1915(a) were not available in that case, the U.S. Supreme Court implicitly recognized that if those alternatives had been "formally sought," the rebuttable adoption presumption set forth in § 1915(a) would apply. 133 S. Ct. at 2565. Thus, even if the requirements of § 1912(d) are not applicable to a parent, the tribe or nation's interests are still preserved. Further, in addition to the express purpose to preserve the interests of Indian tribes and nations set forth in 10 O.S. 2011 § 40.1, several other sections of OICWA set forth requirements specifically concerned with preserving the interests of Indian tribes and nations to Indian children involved in child custody proceedings as defined by § 40.3. See, e.g., §§ 40.6-40.9. Section 40.6, in particular, provides in part:

The placement preferences specified in 25 U.S.C. § 1915, shall apply to all preadjudicatory placements, as well as preadoptive, adoptive and foster care placements. In all placements of an Indian child by [DHS], or by any person or other placement agency, DHS, the person or placement agency shall utilize to the maximum extent possible the services of the Indian tribe of the child in securing placement consistent with the provisions of [OICWA].

[10] Of course, even if active efforts are not required, under state law, the state must still prove "reasonable efforts" were made to provide reunification services. See, e.g., In re J.S., ¶ 14. Inasmuch as we conclude active efforts were made in this case, reasonable efforts were made to provide such services to Father.

[11] We consider the significant factual similarity between Baby Girl and the present case to be the non-relationship between Father and G.V. and the non-existence of an Indian family entity. We note that in Baby Girl the U.S. Supreme Court linked the father's lack of physical and legal custody to his abandonment of the child before she was born. 133 S. Ct. at 2562. Arguably, then, Baby Girl may be understood to require some overt act by the parent to relinquish custody in addition to the absence of any relationship between the parent and child before the requirements of § 1912(d) may be found inapplicable. Consequently, in the present case the "breakup" of an Indian family may yet be plausible because Father never knew Mother was pregnant or that he was even a father to G.V. until nearly two years after the child was born.

[12] While Father was in segregation and in phase unit for six months after segregation ended, DOC offered Father services that DHS encouraged him to take. As of the hearing, however, the DHS caseworker was unaware of any substance abuse program, education, or any program or services Father started while incarcerated.

[13] Father testified that he, in fact, began those classes in the Tulsa County jail and then completed them by correspondence when he was in DOC custody. However, while he said he told the DHS caseworker he completed that program, Father admitted he provided DHS no documentation of that effort. The trial court sustained State's hearsay objection to the introduction of a certificate Father offered as proof that he completed the parenting class. Father did not object.

 

 





 Citationizer© Summary of Documents Citing This Document
 
 
 Cite
 Name
 Level
 
 
 None Found.
 
 
 Citationizer: Table of Authority
 
 
 Cite
 Name
 Level
 
 
 Oklahoma Court of Civil Appeals Cases
 Cite
Name
Level

 2008 OK CIV APP 15, 177 P.3d 590, IN THE MATTER OF J.S.
Discussed at Length
 2011 OK CIV APP 112, 265 P.3d 764, IN THE MATTER OF E.P.F.L.
Discussed at Length
Oklahoma Supreme Court Cases
 Cite
Name
Level

 2004 OK 83, 115 P.3d 829, CONOCO INC. v. AGRICO CHEMICAL COMPANY
Discussed
 2004 OK 93, 103 P.3d 1099, IN THE MATTER OF BABY BOY L.
Discussed at Length
 2006 OK 96, 154 P.3d 1240, TALIAFERRO v. SHAHSAVARI
Discussed
 2011 OK 77, 261 P.3d 1159, IN THE MATTER OF THE ADOPTION OF G.D.J.
Discussed
 2000 OK 82, 13 P.3d 484, 71 OBJ 2668, IN THE MATTER OF A.M. & R.W.
Discussed
 1999 OK 33, 987 P.2d 1185, 70 OBJ 1353, Patel v. OMH Medical Center, Inc.
Discussed
 1984 OK 35, 687 P.2d 121, Messler v. Simmons Gun Specialties, Inc.
Discussed
Title 10. Children
 Cite
Name
Level

 10 O.S. 40.1, Purpose - Policy of State
Cited
 10 O.S. 40.5, Emergency Removal of Indian Child from Parent or Custodian - Order
Cited
Title 12. Civil Procedure
 Cite
Name
Level

 12 O.S. 2602, Lack of Personal Knowledge
Cited
 12 O.S. 2901, Requirement of Authentication or Identification
Cited