IN THE MATTER OF W.P.
2022 OK CIV APP 31
Case Number: 120074
Decided: 07/21/2022
Mandate Issued: 08/17/2022
DIVISION IV
THE COURT OF CIVIL APPEALS OF THE STATE OF OKLAHOMA, DIVISION IV
Cite as: 2022 OK CIV APP 31, __ P.3d __

 

IN THE MATTER OF W.P., Alleged Deprived Child,

BILLY ZANE DEO, Natural Father, Appellant,
v.
STATE OF OKLAHOMA, Appellee.

APPEAL FROM THE DISTRICT COURT OF
OKFUSKEE COUNTY, OKLAHOMA

HONORABLE MAXEY P. REILLY, TRIAL JUDGE

AFFIRMED

Robert L. Irby, THE IRBY LAW FIRM, PLLC, Holdenville, Oklahoma, for Appellant

Max Cook, OKFUSKEE COUNTY DISTRICT ATTORNEY, Albert Kelly, ASSISTANT DISTRICT
ATTORNEY, Okemah, Oklahoma, for Appellee

STACIE L. HIXON, JUDGE:

¶1 Appellant, Billy Zane Deo (Father) appeals a final order terminating parental rights to minor child, W.P., based on the length of time W.P. was placed in foster care, pursuant to 10A O.S.2015 Supp., § 1-4-904(B)(17).

BACKGROUND

¶2 Windi Postoak (Mother) gave birth to W.P. in July 2019. Mother, a member of the Seminole Nation, tested positive for drugs at the hospital and W.P. was taken into emergency custody when he was a few days old. W.P. was placed in an ICWA-compliant kinship placement with Mother's great-aunt, Martha Basquez (Foster Mother), who has adopted W.P.'s half-brother.

¶3 State filed a Petition to adjudicate W.P. deprived as to Mother.

¶4 On June 5, 2020, the trial court adjudicated W.P. deprived as to Father and ordered Father to complete an Individualized Service Plan (ISP). State later filed a Petition to terminate Father's rights on November 18, 2020, alleging Father failed to correct conditions within 90 days and that W.P. had been out of the home six out of the twelve months prior to that filing, pursuant to 10A O.S. § 1-4-904(B)(17). Jury trial was initially set in May 2021, but was continued after the Nation objected that it was not satisfied active efforts had been made to prevent the breakup of an Indian family.

¶5 Termination of Father's parental rights was set for jury trial in October 2021. At the trial court's active efforts hearing preceding trial, the Nation testified it was satisfied with DHS's active efforts, and the trial court determined the State's obligation had been met. Trial on termination of Father's parental rights proceeded on two proposed grounds, failure to correct conditions leading W.P. to be adjudicated deprived and the length of time W.P. had been in foster care.

¶6 But for his first few days, W.P. had resided with Foster Mother and his brother for the entirety of his 27 months. Father testified that he never had a relationship with Mother, and was unaware Mother had become pregnant until DHS sought him out while he was incarcerated. Father remained incarcerated at the time of trial. Father testified he had an upcoming parole hearing, but did not know if it would be granted. If not, he would be required to serve at least 13 more months. Father also testified to an unrelated pending criminal matter, which carried the possibility that he could be incarcerated for another ten years.

¶7 By the time of trial, Father had seen W.P. at a court date,

¶8 Though Father objected to termination of his rights, he also testified that he viewed Foster Mother as W.P.'s Mother. He recognized it would be difficult for W.P. to leave Foster Mother, but contended that this did not necessarily have to occur. Father also testified he had informed his counsel that the best place for W.P. was with Foster Mother. Foster Mother wants to adopt W.P.

¶9 DHS child welfare supervisor Stacey Vass testified that W.P. was doing well in his placement with Foster Mother. She testified that, aside from safety and protection from harm, W.P. needed permanency and connection with family, which he has in his current placement. Child welfare specialist Deanna Byrd testified that it was in W.P.'s best interests for Father's rights to be terminated, and that W.P. would suffer irreparable harm if Father's rights were not terminated. The Nation's reunification and permanency case worker, Sequoya Steve Brennen, who was qualified as an expert witness, opined that returning W.P. to father would result in serious physical or emotional harm to W.P., and it would be in his best interest to terminate Father's rights.

¶10 The jury returned a verdict unanimously in favor of terminating Father's parental rights on both grounds of failure to correct and length of time in foster care. However, the jury failed to identify the conditions Father failed to correct on the verdict form. Therefore, the trial court entered judgment based only on length of time in foster care, and entered an order terminating Father's parental rights on November 24, 2021.

¶11 Father appeals.

STANDARD OF REVIEW

¶12 In a parental termination case, the State has the burden of proof to show by clear and convincing evidence that grounds exist for termination. In the Matter of C.G., 1981 OK 131637 P.2d 66In re C.D.P.F., 2010 OK 81243 P.3d 21Id. at ¶ 5.

¶13 However, because this case involves Indian children, the proceedings must comply with the provisions of the federal ICWA (25 U.S.C. §§ 1901-1963) and the Oklahoma ICWA (10 O.S. §§ 40-40.9). In the Matter of T.L., 2003 OK CIV APP 4971 P.3d 43In the Matter of H.M.W., 2013 OK 44304 P.3d 738

¶14 Under the Acts, the State must prove "beyond a reasonable doubt that continued custody by the parent is likely to result in serious emotional or physical damage to the child." In the Matter of H.M.W., 2013 OK 44In the Matter of V.D., 2018 OK CIV APP 72431 P.3d 381

¶15 Thus, we review the evidence to ensure that the evidence presented by State, if believed, would support a conclusion by any rational trier of the facts beyond a reasonable doubt that continued custody by Father would result in serious damage to the children. In the Matter of IW, 2018 OK CIV APP 6419 P.3d 362

¶16 However, the "beyond a reasonable doubt" standard only applies to the determination under 25 U.S.C. § 1912(f) "that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child." Id. The lesser standard of "clear and convincing" evidence, the state-law mandated burden of proof, is applicable to all other state law requirements for termination, as well as the determination that the State made active efforts to prevent the breakup of an Indian family as required under ICWA, 25 U.S.C., § 1912(d). (See In the Matter of J.S., 2008 OK CIV APP 15177 P.3d 590In the Matter of the Adoption of R.L.A., 2006 OK CIV APP 138147 P.3d 306Matter of the Adoption of G.D.J., 2011 OK 77261 P.3d 1159 In the Matter of E.P.F.L., 2011 OK CIV APP 112265 P.3d 764

ANALYSIS

¶17 Father does not contest that the State met its burden to demonstrate statutory grounds for termination of his parental rights based on the length of time W.P. has been in foster care. Father also does not assert that a determination that termination of his parental rights is in W.P.'s best interest is not supported by clear and convincing evidence. He asserts two grounds on appeal, both based on IWCA--(1) that the evidence was insufficient to demonstrate a finding that active efforts were taken to prevent the breakup of an Indian family, which proved unsuccessful, and (2) that the evidence was insufficient to support a finding that Father's continued custody was likely to result in serious emotional or physical damage to the minor child.

A. Active Efforts

¶18 If applicable, State had the burden of proving as a predicate matter by clear and convincing evidence that '"active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proven unsuccessful."' In the Matter of E.P.F.L., 2011 OK CIV APP 112See In re J.S., 2008 OK CIV APP 15

¶19 State argues on appeal that active efforts were not required as to Father under 25 U.S.C. § 1912(d) because there was no familial relationship to restore or continue, citing Adoptive Couple v. Baby Girl, 570 U.S. 637 (2013). We agree.

¶20 In Baby Girl, the United States Supreme Court held that section 1912(d) applies "only in cases where an Indian family's 'breakup' would be precipitated by the termination of the parent's rights." Id. at 651. The Court explained:

The term "breakup" refers in this context to "[t]he discontinuance of a relationship," American Heritage Dictionary 235 (3d ed. 1992), or "an ending as an effective entity," Webster's 273 (defining "breakup" as "a disruption or dissolution into component parts: an ending as an effective entity"). See also Compact OED 1076 (defining "break-up" as, inter alia, a "disruption, separation into parts, disintegration").

Id. The Court therefore determined that when an Indian parent abandons an Indian child prior to birth and that child has never been in the Indian parent's legal or physical custody, the "breakup of the Indian family" has long since occurred, and section 1912(d) does not apply. Id. at 651-52. Subsequently, the Court in In the Matter of Minor Child G.V., 2016 OK CIV APP 6365 P.3d 89Baby Girl.

¶21 In this case, Father filed no reply responding to State's argument that active efforts were not required. Regardless, the record shows W.P. has never been in Father's care or custody. He has lived in foster care since he was removed from Mother at only a few days old. W.P. has never lived as a family unit with Father, has no relationship or bond with him, and could not be placed in Father's custody by the time of trial due to his incarceration.

¶22 The plain language of section 1912(d), as interpreted by the United States Supreme Court in Baby Girl and applied by In the Matter of Minor Child G.V., does not require states to provide active efforts to create or establish Indian families but only requires active efforts be provided to prevent the "breakup" of existing ones. See also 25 U.S.C. § 1902 (declaring the congressional policy to establish "minimum Federal standards for the removal of Indian children from their families . . . .") (emphasis added). Thus, under the facts of the present case, we find section 1912(d) does not apply because there was no "breakup" of the Indian family precipitated by the termination of Father's rights.

¶23 However, even if section 1912(d) applies, we find the trial court correctly determined that State met its burden of showing by clear and convincing evidence that active efforts were made. Notably, DHS's efforts were hindered by Father's incarceration as well as the COVID-19 pandemic. Particularly, Father's facility did not allow in-person visits with inmates for a number of months prior to trial.

¶24 In October 2021, the Nation's reunification and permanency worker testified the Nation was satisfied with the State's active efforts. Brennen explained that there were certain active efforts the Nation asks that DHS enact with regard to parents who are incarcerated. These included giving Father updates on W.P. and providing photographs; DHS speaking with and visiting Father at his facility; and allowing Father means to communicate with W.P.; Foster Mother, or attorney by letter; with return postage provided. The record shows that DHS pursued these efforts.

¶25 DHS child welfare specialist Byrd testified she sent letters to Father with return postage so that he could write her, W.P., or Foster Mother. She contacted Father's case manager, set up in-person visits with Father once permitted by the facility, talked with Father about services available at the prison, visited W.P. on a monthly basis and provided pictures and updates to Father. Though services were suspended at the prison for part of the pandemic, when they became available, Father was enrolled in two classes.

¶26 Father argues these efforts were insufficient, because he did not receive enough in-person visits, and because he was not provided means to reach W.P. or Foster Mother via telephone, though he testified he requested it. Father's argument on lack of in-person visits ignores the reality of the COVID-19 pandemic, on top of the limitations imposed by his incarceration, and DHS's efforts to maintain written or telephonic communication with Father when prevented from visiting Father in person.

¶27 As to a lack of phone communication, Father did not raise that issue in the active efforts hearing, but raised it during jury trial. To the extent appropriate to consider that evidence, DHS provided Father means to communicate in writing with W.P., Foster Mother or DHS. He never did so.

¶28 Father contends DHS's efforts were inadequate, essentially arguing the State's efforts were passive, not active, citing In the Matter of Minor Child G.V., 2016 OK CIV APP 6 ¶ 35. In that case, a division of this Court noted a distinction between passive and active efforts offered by the Alaska Supreme Court in Pravat P. v. State of Alaska, 249 P.3d 264 (Alaska 2011), which explained:

Passive efforts are where a plan is drawn up and the client must develop his or her own resources towards bringing it to fruition. In contrast, [a]ctive efforts [are] where the state caseworker takes the client through the steps of the plan rather than requiring that the plan be performed on its own. For instance, rather than requiring that a client find a job, acquire new housing, and terminate a relationship with what is perceived to be a boyfriend who is a bad influence, [ICWA] would require that the caseworker help the client develop job and parenting skills necessary to retain custody of her child.

Id. at 271. The G.V. court noted that Oklahoma appellate courts had drawn a similar distinction between active and passive efforts, while also recognizing that a parent's incarceration significantly affects the scope of active efforts the State can provide. 2016 OK CIV APP 6 at ¶ 27(citing In re J.S., 2008 OK CIV APP 15In the Matter of E.P.F.L., 2011 OK CIV APP 112

¶29 While G.V. provides persuasive guidance on applicable law, it does not support Father's characterization of DHS's efforts as merely passive. In G.V., while the father argued DHS was required by its own policy to initiate monthly contact, the Court determined that efforts of DHS which fell short of this requirement nevertheless satisfied section 1912(d).Id. at ¶ 32. On appeal, the Court determined that the State's efforts "though not perfect, crossed the line between passive and active." Id. at ¶ 35. "While the scope of the efforts was limited by Father's incarceration in multiple locations, taken as a whole, this is not a case where a plan was made and Father was left to his own devices to complete it." Id.

¶30 Similarly, Father was not provided a plan and left alone to complete it, despite limitations imposed by his incarceration. DHS provided Father means to communicate with W.P., with Foster Mother, and with DHS; DHS attempted and did communicate with Father in writing and in person; and Father received and worked services. Even though Father contends other efforts might be superior, the record contains clear and convincing evidence of efforts that crossed the line from passive to active. Those efforts were indisputably unsuccessful, where Father established no relationship with W.P., and given his continued incarceration, could not take custody of W.P. While we find that active efforts were not required, to the extent section 1912(d) applied, the trial court did not err by determining that State presented clear and convincing evidence that it made active efforts to provide remedial services and rehabilitative programs to prevent the breakup of the Indian family that were proven unsuccessful.

B. Likelihood continued custody by parent will result in serious emotional or physical damage to the child 

¶31 Father also argues that the State failed to meet its burden to prove beyond a reasonable doubt that "continued custody by the parent is likely to result in serious emotional or physical damage to the child." 25 U.S.C. § 1912(f). State argues that section 1912(f) does not apply or require application of this heightened standard because W.P. has never been in Father's legal or physical custody. Again, we agree.

¶32 The United States Supreme Court addressed this issue in Baby Girl:

Section 1912(f) conditions the involuntary termination of parental rights on a showing regarding the merits of "continued custody of the child by the parent." The adjective "continued" plainly refers to a pre-existing state. . . . . "[C]ontinued" means "[c]arried on or kept up without cessation" or "[e]xtended in space without interruption or breach of conne[ct]ion." (citations omitted.) The term "continued" also can mean "resumed after interruption." (citations omitted.) The phrase "continued custody" therefore refers to custody that a parent already has (or at least had at some point in the past). As a result, § 1912(f) does not apply in cases where the Indian parent never had custody of the Indian child.

Baby Girl, 570 U.S. at 647--48. The Court concluded the father in Baby Girl should not have been able to invoke section 1912(f) because he had never had legal or physical custody of the Indian child. Id. See also In the Matter of Adoption of B.T.S., 2016 OK CIV APP 21371 P.3d 1145

¶33 As noted above, Father has never had physical or legal custody of W.P. Thus, the issue of continued custody, and the heightened burden imposed by section 1912(f), does not apply. However, even if the heightened standard applied, the record supports such a conclusion beyond a reasonable doubt.

¶34 W.P. has resided with Foster Mother for his entire life, but for the first three days. He has never known another home and does not know Father. As mentioned, he and Father have no relationship, and Father has not taken what opportunities have been available during incarceration to foster that relationship. Father presented no plan on how to care for W.P. should he be released from prison. He does not know when he will be released, or where he will live, other than to hope he will be accepted into a reintegration program to provide him with a place to live and necessities. He does not know if W.P. would be allowed to live with him in that program.

¶35 Father acknowledged that he thinks of Foster Mother as W.P.'s mother, and that it would be difficult for W.P. to leave his home. He admitted the best place for W.P. is with Foster Mother, but explained that, in his view, retaining his rights does not necessarily mean that W.P. cannot live with Foster Mother. Father's argument does not appear to be that he can and will do the work necessary to obtain custody and provide safe, adequate care to W.P., when or if he is released, but that W.P. should be deprived of needed permanency in order to preserve Father's rights. In other words, Father seems to contend W.P. should remain with Foster Mother indefinitely, without any assurance of permanency or what his future holds, should Father be released and it be determined W.P. may be safely placed with him, should Father desire it at that time.

¶36 Multiple witnesses testified it was in W.P.'s best interest to terminate Father's rights and/or that he would suffer serious harm if Father retained continued custody. Child welfare supervisor Vass testified W.P. requires permanency and the connection of family, which he has in his current placement. She testified it was in W.P.'s best interest to remain in his current home. Child welfare specialist and permanency worker Byrd testified W.P. is doing well and is happy in his current placement, and that he would suffer irreparable harm if Father's rights are not terminated. Brennen, as expert witness, also testified that W.P. would suffer serious physical or emotional harm if custody were continued, and that it was in W.P.'s best interest to terminate Father's rights.

¶37 On appeal, Father argues State did not meet its burden because Brennen did not offer specifics as to what he meant by "serious physical or emotional harm." "ICWA does not require that the experts' testimony provide the sole basis for the court's conclusion that continued custody will likely result in serious emotional or physical damage; ICWA simply requires that the testimony support that conclusion." Matter of IW, 2018 OK CIV APP 6419 P.3d 362Id. "The expert testimony need not be the sole basis for finding that the continued custody of the child by the parent is likely to result in serious emotional or physical damage, but the expert's testimony must support that finding." Id. (emphasis omitted).

¶38 In addition to Brenner's testimony, the jury, and Court in canvassing the record, may consider the entirety of the evidence of record. We find that the record contains sufficient evidence, as addressed above, that if believed, would support a conclusion beyond a reasonable doubt that continued custody by Father would result in serious emotional or physical damage to W.P. While we hold that section 1912(f) does not apply, to the extent applicable, the trial court did not err in its determination this burden was met.

CONCLUSION

¶39 Father has not contested on appeal that the State established a statutory basis for terminating his rights to W.P. based on length of time in foster care, and that termination of Father's rights was in W.P.'s best interest. We find that sections 1912(d) and 1912(f) of ICWA did not apply to this proceeding, because Father never had legal or physical custody of W.P. However, to the extent applicable, we find the record demonstrates that State met its burdens of proof to demonstrate active efforts by clear and convincing evidence, and that continued custody by Father would result in serious emotional or physical harm to W.P. beyond a reasonable doubt.

¶40 AFFIRMED. 

FISCHER, C.J., and BARNES, P.J., concur.

FOOTNOTES

E.P.F.L., 2011 OK CIV APP 112A.A. v. State of Alaska, 982 P.2d 256 (Alaska 1999), concerning the impact of incarceration on active efforts:

In [A.A.], the Supreme Court of Alaska was asked to determine whether the State of Alaska had met its burden of proof that active efforts had been made to provide remedial services for an Indian family where the father was incarcerated. The Court stated:

A parent's incarceration significantly affects the scope of the active efforts that the State must make to satisfy the statutory requirement. While "[n]either incarceration nor doubtful prospects for rehabilitation will relieve the State of its duty under ICWA to make active remedial efforts," the practical circumstances surrounding a parent's incarceration--the difficulty of providing resources to inmates generally, the unavailability of specific resources, and the length of incarceration--may have a direct bearing on what active remedial efforts are possible. Thus, while the State cannot ignore its ICWA duties merely because of [the father's] incarceration, his incarceration is a significant factor in our evaluation of the adequacy of the State's efforts in this case.